## LAMAR et al. v. HARRIS.

1. A father may, in this State, release to another the right to the custody and control of his minor child.

2. One to whom the parental power over a minor is awarded has no power to appoint a testamentary guardian for such minor.

3. W., by a written agreement, released to L. and wife (his parents-in-law) all his parental power, custody, and control over his minor son, a child less than two years old. L. confided the personal care of the child to his daughter, H., and she since that time has occupied in every way the relation of a mother to the child. L. survived his wife, and died when the minor was nine years old, leaving a will in which he undertook to appoint his son guardian of the minor. H. continued to exercise parental power over the child for more than five years, without interference from the father, and with his full acquiescence. The father, since the agreement with L., has never contributed anything to the support of his child. *Held*, that the father, by long acquiescence in the control of the minor exercised by H. since the death of L., and his failure to contribute anything to its support or to assert his parental authority in that time has lost his right to the custody of the minor.

4. In habeas corpus cases for the custody of a minor, the paramount consideration is the welfare and happiness of the minor and in determining that, the trial court is vested with a large discretion. Where the circumstances justify it, the wishes of the minor may properly be consulted in determining to whom the custody shall be awarded.

Argued May 5, — Decided June 3, 1903.

Habeas corpus. Before Judge Felton. Bibb superior court. September 17, 1902.

*Bacon, Miller & Brunson, T. E Matthews,* and *W. C. Nottingham,* for plaintiffs in error. *Hardeman, Davis, Turner & Jones* and *Dessau, Harris & Harris,* contra.

CANDLER, J. This is a habeas corpus case from Bibb county, involving the custody and control of a minor. The minor in question, Lamar Washington, is a son of one of the plaintiffs in error, W. H. Washington, and of his wife, Alberta Washington, née Lamar. He was born on March 6, 1887, at the home of his mother's parents, Colonel and Mrs. H. J. Lamar, in Vineville, near Macon. About two weeks after his birth his mother died. His father's home was in Nashville, Tennessee. Shortly after the death of Mrs. Washington, W. H. Washington returned to Nashville, leaving his infant son in the care of the Lamar family. About two years later, he returned to Bibb county for the purpose of taking the child back to Nashville with him. In the meantime, however, the Lamars had become very much attached to the child, and objected strongly

63

to having him taken from them.   After some negotiations between Col. Lamar and Mr. Washington, the following written agreement was entered into between them:

"State of Georgia, County of Bibb.   This contract and agreement, made and entered into this 1st day of January, in the year of our Lord eighteen hundred and eighty-nine, between W. H. Washington, of the county of Davidson and State of Tennessee, of the first part, and Henry J. Lamar, of the county of Bibb and State of Georgia, of the second part, witnesseth:   That whereas the said W. H. Washington, the party of the first part, is the father of a certain male child named Henry J. Lamar Washington, now about twenty-two months old, said child being the grandchild of the party of the second part; and whereas the mother of said child is now deceased; and whereas since the death of said mother of the child the same has been taken care of and nurtured by the said party of the second part and his wife; and whereas the said party of the second part hereby promises, proposes, and undertakes for the future to care for, provide for, maintain, and educate the said child as one of his own children, and in all respects to maintain and occupy towards said child the relation of parent and father and to stand 'in loco parentis' towards said child; and whereas the said party of the first part hereby expresses his voluntary consent that the said party of the second part shall have the right to care for, maintain, and educate said child as one of his own children, and in all respects to maintain and occupy towards said child the relation of parent and father, and to stand 'in loco parentis' towards said child:   Now therefore, in consideration of the foregoing premises, and all and singular the same, so far as they relate to and concern him, the said party of the first part hereby voluntarily releases and relinquishes personally unto the party of the second part, and to his wife, Valeria B. Lamar, all his paternal control and power over said child, Henry J. Lamar Washington, and confides to the said party of the second part and his wife all his paternal power and control over said child, and agrees that the said party of the second part and his wife shall stand 'in loco parentis' toward said child.   In testimony whereof, the said W. H. Washington has hereto set his hand and seal, and the said Henry J. Lamar has also hereto set his hand and seal as signifying his acceptance of the same."

This agreement was signed by both the parties, and was executed

in the presence of two witnesses. Henry J. Lamar died December 25, 1896, his wife having died about two years previously. Shortly after his birth, the infant, Lamar Washington, was entrusted to the care of his maternal aunt, Mrs. Valeria L. McLaren, now Mrs. Valeria L. Harris, the defendant in error, and ever since that time he has lived with her, in every respect as her own child. Henry J. Lamar left a will, which contained, among others, the following provision: "Having received by due transfer all the parental powers of his father over my said grandson [Henry J. Lamar. Washington], I hereby appoint Henry J. Lamar Jr. [a son of the testator], guardian of his person; and in the event of his failure or inability to act, I appoint Walter D. Lamar such guardian in his stead." Certain real and personal property were also bequeated to H. J. Lamar Jr., in trust for H. J. Lamar Washington, and the trustee was directed to apply the income thereof to the education and maintenance of the cestui que trust during his minority, "provided he remains, and so long only as he remains, under the control and influence of, and is domiciled with, my immediate family, or some member thereof; but in the event my said grandson should be removed beyond the limits of the State of Georgia, or should otherwise be taken from the control and influence of my said immediate family, or some member thereof, or his domicile be changed therefrom, said income, interest, and profits shall no longer be applied to his support, maintenance, and education, . . but shall revert to and become a part of my estate."

On April 5, 1902, Mrs. Harris filed in the superior court of Bibb county her equitable petition in which she set out substantially the foregoing facts, and also the following: Since the death of H. J. Lamar Sr., W. H. Washington has never set up any claim or asserted any rights to the custody and control of Lamar Washington, but Mrs. Harris has had such custody and control. She has stood in the position of a mother to said minor, and has the affection of a mother towards him, while he has the affection of a son towards her. On the day the petition was filed, Henry J. Lamar Jr. gave notice to Mrs. Harris that on the following day W. H. Washington would be in Macon, and that Lamar Washington would have to return with his father to Nashville, Tenn. From the time that the child was turned over to petitioner as an infant she has had charge of him; she nurtured him in his infancy, nursed him

through several illnesses, attended and watched over him, and in every respect brought him up as her own child, and learned to love him as her own offspring. The petition prayed for an injunction to restrain Henry J. Lamar and W. H. Washington from interfering with her possession, custody, or control of Lamar Washington; for general relief; and for process. Subsequently she amended her petition, claiming that she was entitled to the custody of the child, and praying for a writ of habeas corpus and for an order decreeing her to be the lawful custodian of the child. The defendants filed separate answers. Both claimed that under the will of H. J. Lamar the testamentary guardian was entitled to the custody of the child, and denied that Mrs. Harris had had such custody since the death of her father, except by the permission of the guardian, H. J. Lamar Jr., who, it was averred, had been the legal custodian of the child since the death of H. J. Lamar Sr., and had been recognized as such by Mrs. Harris. By an amendment to his answer the defendant Washington set up that "if the court should determine that under the law the provisions of said will [of H. J. Lamar Sr.] are inoperative and of no effect, then respondent submits to the court that the right to the custody and control of said child has revested in this respondent, and he alone has such right; and in the event the law prevents Col. Lamar's wishes as to the custody 'of said child from being carried into effect, then this respondent here and now asserts his right to the custody of said child as his father, and prays the court . . to award to this respondent the custody of said child." The evidence introduced on the trial was voluminous, and in many particulars conflicting. Throughout the record it is apparent that, as in all cases where members of the same family are pitted against each other with flesh and blood as the stake, the trial was marked by much bitterness of feeling. In the foregoing statement we have studiously endeavored to eliminate all points as to which there was a conflict, and to recite only those facts which were not disputed and which have a material bearing on the decision of the questions at issue. On the trial the court passed an order in which it was "adjudged that the custody of said Lamar Washington is awarded to the plaintiff, and the defendants are enjoined as prayed in the petition." The defendants thereupon excepted.

1.  There can be no doubt that the agreement between H. J.

Lamar Sr. and W. H. Washington, concerning the custody and control of the minor, was valid and binding, and gave to Lamar and his wife the right to direct and control the child. It is expressly provided by statute that parental power over a child may be lost " by voluntary contract, releasing the right to a third person," and this court has so often upheld such contracts that the right to make them is no longer open to question in this State. Civil Code § 2502 (1); *Janes* v. *Cleghorn,* 54 *Ga.* 9; *Bently* v. *Terry,* 59 *Ga.* 555; *Miller* v. *Wallace,* 76 *Ga.* 479; *Townsend* v. *Warren,* 99 *Ga.* 105.

2. The common law of England, and, so far as we are aware, the statute law of every State in this country, if not in the civilized world, recognize the father as the legitimate, natural guardian of his child. The law does not fly in the face of nature, but rather seeks to act in harmony with it, and to that end encourages the formation and continuance of those ties which, by the inscrutable providence of God, bind man to his own flesh. A father may part with the legal control over his offspring; but the one to whom such control is granted can not perpetuate the alienation of child and parent by the appointment of a testatmentary guardian for the former. As has been seen, the agreement between Washington and Lamar Sr. was a valid contract, and binding upon the parties. By its terms, however, the parental control over the minor was released only " unto the party of the second part [Lamar] and his wife." No provision was made for the continued separation of father and child after the death of Col. Lamar and his wife; and in the absence of such a provision in the contract, the law will not presume that the parties intended that the agreement should extend over and beyond its expressed limitations. In the early case of *Taylor* v. *Jeter,* 33 *Ga.* 195, the parents of the minor had been divorced, and the custody of the child awarded to the mother, who subsequently died, leaving a will in which she undertook to appoint her father guardian of the minor. Afterwards the father (the grandfather of the minor) died, leaving a will in which he confided the guardianship of the minor to his son. The father of the minor obtained a writ of habeas corpus, on the hearing of which the custody of the child was awarded to him, and on writ of error the judgment of the lower court was affirmed. The court, in the opinion (p. 200), said: " Is the office of guardian or trustee, ap-

pointed by the chancellor, transmissible by the will of the appointee? We hold that it is not. It is a personal trust, revocable during the life of the appointee (upon a proper case made), by the rightful tribunal, and invariably terminating with that life." So, also, in *Grimsley* v. *Grimsley*, 79 *Ga.* 398 (2), it was ruled: "A father may appoint a testamentary guardian for his own children, but not for the children of anybody else. Under the appointment of one as testamentary guardian of children of a person other than the testator in this case, the appointee became a trustee for such children, and held the property devised as such, and not as guardian." See the rule on this subject laid down in Woerner, Am. L. Guard. §20, p. 61, where the *Grimsley* case, supra, is cited as authority.

3. It follows, then, from what has been ruled, that upon the death of Col. Lamar the right to the custody of the minor, Lamar Washington, again vested in his father, W. H. Washington. The father, however, did not at that time see fit to resume his parental control, nor does he now seek to do so except in the event that it is decided "that under the law the provisions of said will touching the custody of said child are inoperative and of no effect." On the contrary, he "fully acquiesces in all the provisions of Col. Lamar's will touching the control of Lamar Washington, and desires still that the same be carried out." In the meantime, it must be borne in mind, Lamar Washington has been, almost since the hour of his birth, under the direct personal care and attention of Mrs. Harris, the defendant in error. Always a delicate child, she has nursed him in sickness, worried with him through all the peevish and fretful years of childhood, traveled with him both in this country and abroad, and has ever lavished upon him the devotion and the watchful tenderness of a mother. To quote from the able brief of learned counsel for the plaintiffs in error, "this youth is no longer a milk-fed baby, or an infant of tender years, especially needing a woman's nursing and care." We do not think, however, that that fact is in itself an argument for tearing apart the ties that have slowly formed during the tedious years when he was a milk-fed baby and an infant of tender years. The acquiescence of the father in Mrs. Harris's custody of his child was complete, before and after the death of Col. Lamar. He was well aware of the stringent provisions of the will left by the latter, that Lamar Washington should, during his minority, remain "under the control and influence of, and [be] dom-

iciled with, my immediate family, or some member thereof." He knew with which member of the Lamar family the child was domiciled and under whose control and influence he was, and no word of protest did he utter. When he might legally have claimed the child, he did not do so. He waited for more than six years, until this controversy arose, and now says that if the court should hold that the appointment of a testamentary guardian is invalid, he wishes to reassert his parental rights. On this branch of the case we think that the decisions in *Bently* v. *Terry*, 59 *Ga.* 555, and *Townsend* v. *Warren*, 99 *Ga.* 105, are controlling. In the first of those cases, it appeared that the child, an infant of tender years, had been confided by its parents to a maternal aunt. As to whether there was an express verbal contract on the subject between the parents and the aunt the evidence was conflicting. At the time the transfer of custody was made the child was sick, and the aunt kept it for five years, and nursed it "into vigor and renewed life." The father sued out a writ of habeas corpus, and the court below decided in favor of the retention of the child by the aunt. This court affirmed the judgment, and in the opinion Jackson, J., said: "The contract when made and executed in part, as in this case, is clearly irrevocable by the parent, unless for good cause. This change of mind is not such good legal cause. It would be wrong to hold that, after the child has been nursed, and loved, and cherished under the contract for five years, it could be revoked at pleasure by the parent. If the child were badly treated, it might be annulled; if any other good legal reason arose, it could be set aside as any other contract which was violated; but for no cause at all, it can not be."

We are not unmindful of the argument contained in the following paragraph of the brief of counsel for the plaintiffs in error: "If, even under the contract of adoption in this case, Col. Lamar did not acquire the testamentary power of appointing a guardian for the child, his exercise of that power has been recognized, approved, and ratified by W. H. Washington, the father, by solemn declaration in judicio, as well as by actual, continuous, and continuing acquiescence, both in word and deed, since Col. Lamar's death in 1896. This is equally true, also, as to every member of the family, especially as to Mrs. Harris herself, who testifies that she procured the appointment to be made." Unquestionably, in a contest between Washington and the appointee under the will, this argument would

carry great weight; but can the same thing be said as to Mrs..Harris? It is true that she testified that she suggested the appointment of her brother as guardian for her nephew, and it is equally true that for a long time after her father's death she regarded her brother as the child's guardian. We have seen, however, that that appointment was inoperative and had no effect upon the relations between the minor and his uncle. Can Mrs. Harris be said to have acquiesced in the non-existent guardianship of Lamar, any more than Lamar can be said to have acquiesced in the very real custody of the child by Mrs. Harris? She had the actual physical possession of the minor,— he had only a fictitious authority. The acquiescence of all parties to the arrangement subsisting inured to her benefit, rather than to his. The difference between her position and Washington's is apparent at a glance. Washington had, at the time of Col. Lamar's death, the right to the custody of the child,— she had not. The lapse of time without a change in the status of the child worked against Washington and in favor of her. Both, of course, were chargeable with knowledge of the legal inefficacy of Col. Lamar's appointment of a guardian. His failure to assert his parental rights tended to prevent their assertion, while her erroneous belief that the testamentary guardianship was valid had, in our opinion, no effect upon her rights one way or the other.

4. It is hardly necessary to reiterate the well-recognized and universally applied doctrine that in habeas corpus proceedings for the possession of a minor the paramount consideration is the welfare of the child; that in determining this question the trial court is invested with a large discretion; and that on writ of error that discretion will not be controlled unless abused. There is nothing to indicate in the present case that the trial judge did not use his discretion wisely and cautiously. The case was ably and warmly contested, and, as before stated, much bitterness was exhibited. In reaching a proper conclusion it was necessary to make many allowances for the personal feeling of the parties. Aside from the purely mercenary aspect of the case, the trial judge evidently took into consideration the wishes of the minor himself, who, in an affidavit, expressed his desire to remain with his aunt, who, since his earliest infancy, has been his only mother. This was of itself a weighty consideration. He is no longer a child, but a youth bordering on manhood, and is fully capable of deciding in a matter of

this sort what will work best to his happiness.   We do not see any error in the use of the discretion vested in the court below.

The defendant in error, by cross-bill of exceptions, complained of the refusal of the court to admit certain evidence, and to allow a petition of the minor to be filed as a part of the record in the case. As the judgment on the main bill of exceptions is affirmed, the writ of error on the cross-bill will, in accordance with the settled practice of this court, be dismissed.

*Judgment on main bill of exceptions affirmed ; cross-bill dismissed. By five Justices.*