## STANFORD v. GRAY et al.

No. 2339.   Decided December 31, 1912.   Rehearing Denied January
23, 1913 (129 Pac. 423).

1. HABEAS CORPUS—SURRENDER OF CUSTODY—VALIDITY OF CONTRACT.
   A contract by a parent, fairly made, surrendering the custody
   of a child, as to a children's home, is valid as between the par-
   ties, but is unenforceable if contrary to the child's interest.
   (Page 235.)

2. EVIDENCE—PRESUMPTIONS—FOREIGN STATUTES.   In absence of
   contrary evidence, it is presumed that the law of California re-

lating to the forfeiture of the custody of minor crildren is the
same as the law of Utah.[1]    (Page 238.)

3. HABEAS CORPUS—CUSTODY OF CHILD—CONTRACTS—DURESS—EVI-
   DENCE.   Evidence, in habeas corpus to obtain custody of plain-
   tiff's child which she surrendered to another, *held*, not to sustain
   a finding that the contract surrendering custody was executed
   by plaintiff through fraud or coercion.   (Page 239.)

4. HABEAS CORPUS—CUSTODY OF CHILD—SURRENDER—RECOVERY—
   BURDEN OF PROOF.   The burden is on a parent, who has con-
   tracted away the custody of a minor and seeks to recover it, to
   show that it is not receiving proper care or proper physical,
   moral, and intellectual training.   (Page 241.)
   STRAUP, J., dissenting.

APPEAL from District Court, Third District; *Hon. F. C.
Loofbourow,* Judge.

Action by Selma Stanford, attorney in fact for Belle Han-
sen, on behalf of Robert Schroyier, against B. B. Gray and
another.

Judgment for plaintiff.   Defendants appeal.

REVERSED, WITH DIRECTIONS TO VACATE DECREE AND EN-
TER DECREE AS DIRECTED.

*W. D. Riter* and *R. A. McBroom* for appellants.

*W. R. Hutchinson* and *Cheney & Jensen* for respondent.

STATEMENT OF FACTS.

This is a *habeas corpus* proceeding involving the right to
the control and custody of a child born to respondent, Belle
Hansen, out of lawful wedlock.   The facts regarding the
paternity of the child and the circumstances under which it
was born, as found by the trial court, are as follows:

"That the said Belle Hansen is, and has been for the
period of twenty-four years immediately preceding the filing
of this complaint, a resident of the City and County of San

[1] Oak Leather Co. v. Union Bank 9 Utah, 87, 33 Pac. 246; Dignan
et al. v.  Nelson et al., 26 Utah, 186, 72 Pac. 936.

Francisco, State of California; that Robert Schroyier, an infant male child, two years and ten months of age, is the child of the said Belle Hansen by birth, having been born out of lawful wedlock on the 14th day of December, 1908, at the City of Seattle, State of Washington; that the father of said child is Clarence Buzzini, who at all times referred to in the petition of the plaintiff was and is a resident of the City and County of San Francisco, State of California; that the said Clarence Buzzini had been for some years prior to the birth of said child plaintiff's sweetheart; that he had betrayed her."

The court further found, and the finding is supported by the evidence:

"That said child by reason of its birth, under the circumstances aforesaid, took the name of Robert Schroyier, the maiden name of the said Belle Hansen prior to her present marriage; that the said Belle Hansen, on the 24th day of June, 1910, was lawfully married to William Hansen at the City and County of San Francisco, State of California, and ever since said date they have been and now are husband and wife residing in said city and state, where they have at all times since their said marriage maintained a home and residence; that prior to the 24th day of June, 1910, the said William Hansen then desiring to marry the said Belle Schroyier, requested of her father, J. B. Schroyier, his consent to such marriage; . . . that said consent was given with the express agreement and understanding on the part of the said William Hansen as made with the said J. B. Schroyier that the said William Hansen would maintain, educate, and support the said minor child, Robert Schroyier."

Mrs. Hansen returned from Seattle to San Francisco about February, 1909, bringing with her the child. On arriving in San Francisco Mrs. Hansen went with the child to the home of her sister, Mrs. Perkins, at which place she and the infant remained for about two weeks. From her sister's place she went to the home of her parents, J. B. and Elizabeth Schroyier. Soon after returning to the home of her parents, she obtained employment in San Francisco at which

she earned from ten to fifteen dollars per week. On obtaining employment Mrs. Hansen placed the child in the home of a Mrs. Hess, where it was taken care of by Mrs. Levens, a daughter of Mrs. Hess. The expense of keeping and maintaining the child at this private home was three dollars and fifty cents per week, which was paid by Mrs. Hansen from the money earned by her daily labor. The child remained with and was cared for by Mrs. Levens until September 12, 1910, a period of about eighteen months, when it was put in the Children's Home Society of California by Mrs. Hansen. While the child was with Mrs. Levens, Mrs. Hansen called to see it quite often and occasionally would take it with her to the home of her parents and sometimes keep it there for "a day or two." About June, 1909, Mrs. Hansen met her husband, William Hansen, to whom she was married June 24, 1910. These parties, during their courtship, which lasted about one year, together called quite often at Mrs. Levens' to see the child. Mr. Hansen was by profession a dentist, but had for more than a year prior to his marriage practically abandoned his profession and had devoted nearly all his time to inventing a device for starting gasoline automobiles. At the time of his marriage, and for several months thereafter, Hansen, so he says, was "practically stranded" financially. The Hansens, being without means to provide and furnish a home for themselves, made arrangements with the Schroyiers, Mrs. Hansen's parents, to board with them until Hansen should realize an income from his invention. His finances, however, at the time of the trial, had very much improved, and he was receiving an income from his invention of from $100 to $300 per month.

After her marriage Mrs. Hansen continued to have Mrs. Levens keep the child and care for it. Desiring to assist her husband in defraying the expense of patenting his invention, she decided to take the child from the private home of Mrs. Levens and put it where she would be relieved of the burden of paying three dollars and fifty cents per week for its maintenance. On September 8, 1910, she wrote to M. J. White, who was secretary of the California Society

for the Prevention of Cruelty to Children, asking his assistance to get Buzzini to support the child and to find a cheaper lodging and boarding place for it, promising on her part to try and get some one to adopt it. In her letter to Mr. White, among other things, she says:

"He (Buzzini) promised my sister and myself that he would do the right thing by the baby if he got a steady position in the fire department. He has passed the examination and has not done anything, and failed to do what he promised. I was just married again and now my husband has learned of the baby having no name. He has threatened to leave me. I am married two months to him. He will not give me a cent. So I am working every day to support the baby and myself. But I cannot give the child the proper care it should have, and I am doing wrong by raising it up without a name. . . . Please see if you could do something for me or help me to get him in some home. I will give a little money each month to try and get some one to adopt him, to give him a name and father. As it is now he is without both."

In reply to this letter, Mr. White invited Mrs. Hansen to call and see him at his office, which she did September 12, 1910. The result of this conference, as found by the court, was that:

"On September 12, 1910, at San Francisco, Cal., Belle Hansen, the mother of said child, being the sole and only person entitled to his guardianship, custody and control, delivered and surrendered the same to the Children's Home Society, a corporation of California, and, at the time of delivering the child as aforesaid, signed and delivered to said society a written instrument as follows: 'County of San Francisco, State of California—ss.: Know all men by these presents, that I am the mother and only legal guardian of a minor child known as Robert Schroyier and born December 14, 1908; and that, because of my inability to properly provide for and bring up said child, do hereby fully, freely and forever relinquish and abandon to the Children's Home Society of California, all my right of custody, serv-

ices and earnings of said minor child to the end that a home may be procured for him. That I do hereby authorize and request said Children's Home Society to place said child in a home at its discretion, and I hereby waive right to notice of any proceedings for his adoption, and consent to the same in any case approved by said society, its superintendent or president, or, if requested by the society, I hereby agree to appear and consent. That I will not seek to know with whom, or where, the said child is placed, but intrusting his well-being to said Children's Home Society, will in no way disturb or interfere with the provision made for him. Witness my hand and seal at San Francisco, California, this 12th day of September, 1910. Mrs. Belle Hansen. Witnesses to signature: Mrs. K. M. White, J. H. Fairweather.' "

The foregoing instrument was duly acknowledged by Mrs. Hansen before a notary public.

The court further found:

"That she was driven to her said act by the necessity and distress of her situation; that she was greatly annoyed and distressed mentally by reason of her circumstances and surroundings and by reason of the differences between herself and her husband and the threatened estrangement between them and by reason of her family relations; . . . that by reason of her said mental condition, caused by the surroundings aforesaid, for many days prior to the signing of said instrument, her mind was excited and disordered; . . . and that while being in said mental condition, and acting under sudden impulse and without knowing the full contents of said instrument or its effect and purport, she signed the same on the advice and solicitation of the said Mr. White, in whose integrity, at that time, she had utmost confidence."

The court also found that:

"Thereafter, about the latter part of October, 1910, the said Children's Home Society, acting under and in accordance with said written instrument, at San Francisco, Cal., placed said child in the custody of the defendants, to the

end that he might be nursed, supported, educated, and adopted by the defendants; that the defendants took said child into their possession and have ever since kept, maintained, nursed, and supported him with the utmost care and tenderness and have formed a deep attachment and affection for him, and are desirous of continuing to support and educate him, and are willing and ready and intend to adopt him under and in accordance with the laws of Utah, and have kept and detained and are keeping and detaining him for the purpose aforesaid and not otherwise. The defendants are amply able to maintain, educate, and support said child and are in all respects fit and suitable persons to adopt him and to have his custody and control."

The evidence shows, and the court found:

"That, immediately after receiving possession of said child, the defendants removed it from the City and County of San Francisco, State of California, to the City of Salt Lake, State of Utah, and that ever since on or about the 18th day of October, 1910, the said defendants have resided in the City of Salt Lake, State of Utah, and have had in their possession the said infant child, . . . and that the plaintiff herein did not know where said child was from and after the date when she delivered possession of said child to the said society in the City of San Francisco, State of California; that on or about the 21st day of July, 1911, she learned for the first time that said child was in the possession, custody, and control of the said defendants."

As conclusions of law the court found:

"(1) That the plaintiff, Belle Hansen, is a fit and proper person to have control and custody of said minor child, Robert Schroyier, and is entitled to possession and custody of said minor child.

"(2) It is and would be for the best interest of said child to deliver him to its mother, Belle Hansen.

"(3) That the purported relinquishment signed by the plaintiff is no bar to plaintiff's rights to recover said child.

"(4) That plaintiff is entitled to a judgment and decree against said defendants as prayed for in her complaint, and

that said child, Robert Schroyier, is illegally restrained and detained by said defendants."

A decree was entered giving to the plaintiff, Belle Hansen, the custody and control of the child. To reverse the decree defendants prosecute this appeal.

McCARTY, J. (after stating the facts as above).

The first question presented by this appeal is: Did the court err in deciding that the relinquishment executed by Belle Hansen September 12, 1910, which is set forth in the foregoing statement of facts, was not a bar to her right to recover the child?

Respondents contend:

(1) That contracts by which a parent seeks to transfer and surrender the custody of his infant child to another are void as against public policy; and (2) that, assuming, for the purposes of this case, contracts of this kind, when fairly and voluntarily entered into, are binding between the parties, the facts and circumstances surrounding the execution of the contract in question render it invalid.

There are some authorities which hold that a contract made by a parent in which he surrenders the care, control, and custody of his minor child to another is void as against public policy. The great weight of authority, however, sustains the position of appellants that a parent may by contract legally transfer and surrender his infant child into the custody of another where the interest of the child is not prejudiced by the transaction, and in all controversies arising respecting the custody of the child after such transfer and surrender have been made, the paramount consideration—the question of controlling importance—is the interest, welfare, and happiness of the child. In other words, while contracts of this kind, fairly and voluntarily entered into, are valid as between the parties, they will not be enforced to the detriment of the child. The earliest case on this question to which our attention has been called is *Matter of McDowle*, 8 Johns. (N. Y.) 328. In that case an indenture of apprenticeship was executed by the parent

but not in compliance with the statute. The parent, claiming that the indenture was therefore void, sued out a writ of *habeas corpus* to regain the custody of the infant. The court said:

"There is nothing before the court to show any improper treatment of the infant, nor that the party to whom the father intended to bind him has not hitherto faithfully performed the stipulations of the indenture. This is not a case then in which the father has any equity, or any right to complain. He may be bound still by the covenants in the indenture, though the infant is not."

In the case of *Curtis v. Curtis,* 5 Gray (Mass.) 537, the court said:

"We are relieved from the necessity of going into the question, how far the indenture is valid and binding upon the minor under the laws of Connecticut. The only question is, how far it affects the mother's rights. And the court are all of the opinion that, so far as the rights of the mother are concerned, she has relinquished them by this instrument, which operates either as a contract or an estoppel—and it is immaterial which—to prevent her from now setting up her rights. If the child should object, we should be obliged to regard the provisions of the indenture with greater care, and ascertain its legal force and effect in Connecticut, where it was made, and in which state apparently the parties had their domicile."

In the case of *Legate v. Legate,* 87 Tex. 248, 28 S. W. 281, the court, in the course of a well-considered opinion, says:

"The right of the parent or the state to surround the child with proper influences is of a governmental nature; while the right of the child to be surrounded by such influences as will best promote its physical, mental, and moral development is an inherent right, of which, *when once acquired,* it cannot be lawfully deprived. Ordinarily the law presumes that the best interest of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they may be, though wealth and worldly advancement may be offered in the home of another. Where, however, a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child by writ of *habeas corpus,* such parent is invoking the exercise of the equitable discretion of the court to disrupt private domestic relations which he has voluntarily

brought about, and the court will not grant the relief, unless up-on a hearing of all the facts it is of the opinion that the best in-terests of the child would be promoted thereby. It is sometimes said that such a voluntary transfer is 'void,' or that it is 'contrary to public policy;' but the cases using such language show that it is not used in an absolute sense, but in the sense that such trans-fer is no impediment to the action of the court in determining what is best for the interest of the child. The law does not prohibit such a transfer, but, on the contrary, allows the child to reap the benefit thereof when it is to its interest so to do."

To the same effect are the following cases: *Hohenadel v. Steele,* 237 Ill. 229, 86 N. E. 719; *Dumain et ux. v. Gwynne,* 10 Allen (Mass.) 270; *Bonnett v. Bonnett,* 61 Iowa, 199, 16 N. W. 91, 47 Am. Rep. 810; *Carpenter v. Carpenter,* 119 Mich. 167, 77 N. W. 703; *Miller v. Miller,* 123 Iowa, 165, 98 N. W. 631; *Anderson v. Young,* 54 S. C. 388, 32 S. E. 448, 44 L. R. A. 277; *Lamar v. Harris,* 117 Ga. 993, 44 S. E. 866; *Carter v. Brett,* 116 Ga. 114, 42 S. E. 348; *Fletcher v. Hickman,* 50 W. Va. 244, 40 S. E. 371, 55 L. R. A. 896, 88 Am. St. Rep. 862; *Clark v. Bayer,* 32 Ohio St. 299, 30 Am. Rep. 593.

Moreover, we have a statute which recognizes the validity of contracts of this character. Comp. Laws 1907, sec. 720x27 provides:

"No parent or guardian or other person who, by instrument in writing, surrenders or has surrendered heretofore, the custody of a child to any children's aid society or institution, shall thereafter, contrary to the terms of such instruments, be entitled to the custody or control or authority over, or any right to interfere with, any such shild, and these same conditions shall prevail where the child is or has been delivered to the children's aid society or institu-tion by the action of any proper court."

The second paragraph, or subdivision, of section 720x23 of the same act, is as follows:

" 'Institutions' shall mean any building, or buildings, public or private, under the control of a competent board of managers, and used as a home or place of detention, correction, or punishment for delinquent or dependent children."

The trial court found, and the finding is supported by the evidence, that:

"Said Children's Home Society . . . was a corporation duly organized under the laws of the State of California, for the purpose of taking possession of and finding homes for abandoned children, and was an institution holding and possessing private buildings at various places in California under the control of a competent board of managers, used as a home or place of detention, correction, or punishment for delinquent or dependent children."

Under the foregoing provisions of the statute a parent may, in this state, in pursuance of an instrument in writing such as the one under consideration, duly executed by him, surrender and forfeit his right to the custody of his infant child.

There being no evidence to the contrary, it will be presumed that the law of the State of California relating to the forfeiture of the custody of minor children is the same as the law of this state. (*Oak Leather Co. v. Union Bank,* 9 Utah, 87, 33 Pac. 246; *Dignan et al. v. Nelson et al.,* 26 Utah, 186, 72 Pac. 936.) It therefore necessarily follows that contracts of this kind, fairly and voluntarily entered into, being binding in this state, are presumed to be valid when executed in the State of California. Counsel for respondent, however, vigorously contend that, under the peculiar facts of this case, the presumption that the law of California with respect to "the forfeiture of the right of custody and control of minor children" is the same as the laws of the State of Utah, cannot be indulged in. Appellants, "for the purpose of showing the state of the law in . . . California in regard to instruments," such as the one under consideration, introduced in evidence a portion of the decision in the case of *Campbell v. Wright,* 130 Cal. 380, 62 Pac. 613, which is as follows:

"By the former section the power of the court to appoint guardians is limited to the case of 'minors who have no guardian legally appointed by will or deed,' and the same limitation is prescribed by section 243 of the Civil Code, and section 241 therein cited. In the latter section the power of the parent to dispose of the custody of the child by will or deed is expressly recognized, and this must be taken as a recognition of the general right of the parent to dispose of the custody of the child, of which it is but a special example; for it would be unreasonable to suppose that the legislature

intended to limit or restrict a right universally recognized in our own and in all systems of law to the single case provided for, which must therefore be regarded simply as an application of the recognized principle."

It is insisted that, appellants having introduced evidence to show that the state of the law in California is the same as the law of this state, it must be presumed that they introduced all of the law of that state relating to this particular subject. The portion of the decision in the case of *Campbell v. Wright, supra,* introduced in evidence, does not purport to contain either in detail or in substance the statute of California on this matter. Certain sections of the statute are referred to in the opinion and in a measure construed; but, as stated, no part of the statute is incorporated therein. The portion of the decision referred to, no doubt, was put in evidence for the purpose of showing the "state of the law of California" on the question here in controversy as construed by the Supreme Court of that state, and the decision seems to recognize the validity of contracts of the character of the one under consideration.

Mrs. Hansen seeks to avoid the contract on the grounds: First, that she executed it under irresistible pressure of circumstances, and that her mind at the time she signed the document was, and for several weeks prior thereto had been, as found by the court, "excited and disordered;" and, second, that when she executed the relinquishment and delivered the child to the Children's home Society of California, she understood and believed that she was placing it in that institution temporarily, "for a little while" only, and that she intended after the child had remained there "for a few weeks" to return for it, take it to the home of her parents where she and her husband were lodging and boarding, and have her husband adopt it. There is absolutely no evidence whatever tending to show that Mrs. Hansen's mind was either "excited" or "disordered" at or immediately prior to the time she executed the relinquishment. The only inference of which the evidence is susceptible is that she was in good health and in possession of her faculties when

she signed the document; and the evidence is all but conclusive that she knew and understood the terms of the relinquishment and intended when she signed it to transfer and permanently surrender the right to the care and control and custody of the child to the Children's Home Society of California. In her letter to M. J. White (excerpts from which appear in the foregoing statement of facts), written four days before she executed the relinquishment, she expressed a desire to have some one adopt the child "to give him a name and a father." Eight days after she executed the relinquishment, she again wrote to Mr. White, and, among other things, said:

"I told Mrs. Levens I had a home for good for the baby. . . . I think I have done what is right by the baby by adopting him out as I am sure he will have a name and a home."

In another letter that she wrote to Mr. White September 20, 1911, more than four months after she executed the relinquishment, she said, referring to the child, "You took him to adopt." M. J. White testified that, before Mrs. Hansen executed the relinquishment, he explained the terms of the document to her. On this point he testified, in part, as follows:

"On September 12, 1910, she called at my office. . . . She said ". . . she wanted to place the child for adoption. I had a long talk with her, calling to her mind and trying to impress on her the seriousness and importance of giving away her child. . . . I handed it (the relinquishment) to her to read, and she held it in her hand. I discussed the provisions of it with her, and the importance of the step she was taking. It is our purpose to prevent a parent from giving away a child if there is any way which it can be kept by the parents, and for that reason I dwelt particularly upon the act she was about to do."

The evidence of Mr. White on this point is corroborated by the testimony of the subscribing witnesses to the relinquishment, both of whom were present and heard what was said on that occasion by White and Mrs. Hansen. While

some parts of Mrs. Hansen's testimony is to the effect that she was ignorant of the terms and conditions contained in the relinquishment when she signed it, yet the statements made by her in her correspondence with Mr. White, above referred to, we think, is all but conclusive that she did know and understand the terms and conditions of the instrument. The findings of fact made by the court that Mrs. Hansen signed the relinquishment "while acting under sudden impulse and without knowing the full contents of said instrument or its purport and effect," and that she signed it under an "irresistible pressure of circumstances," are not supported by the evidence.

We now come to the question of whether, under all of the facts and circumstances as disclosed by the record, the social and intellectual training, as well as the future happiness, of the child, would be better promoted by restoring it to the custody of Mrs. Hansen than by leaving it in the care, control and custody of appellants. As we have pointed out, the weight of authority, which of course includes the better reasoned cases, holds that, where a parent in **4** writing voluntarily relinquishes and surrenders the custody of his infant child to the custody of another, he can not recover the custody of the child in his own right; and, where the parent in such case comes before the court seeking to recover the custody of the child the burden is on him to show, not on his own behalf, but on behalf of the child, that it is not receiving the proper care, or that its physical, moral, and intellectual training is not what it should be. The right, therefore, of a parent in such case to the custody of the child, does not depend altogether on the question of whether he is a suitable person to have the care and custody of the child as counsel for respondent seem to contend. Tested by the foregoing rule, which we think is a wholesome one, do the facts in the case support the decree of the court? We think not. The court found, and the finding is supported by the evidence, that appellants, ever since the child was given into their custody, have "kept, maintained, nursed, and

supported him with the utmost care and tenderness and have formed a deep attachment and affection for him and are desirous of continuing to support and educate him, . . . and are amply able to maintain, educate, and support said child, and are in all respects fit and suitable persons to adopt him and to have his custody and control." We do not wish to be understood as holding, or even intimating, that the Hansens are unsuitable persons to have the care and custody of the child in question. What we do hold is that, Mrs. Hansen having voluntarily relinquished and surrendered her right to the care and custody of the child, the burden is on her to show that the parties who acquired the custody of the child by virtue and in pursuance of the relinquishment have in some way been derelict in their duty to the child, and that it would be better for the best interests of the child to take it out of their custody and return it to her. This she has wholly failed to do.

We have examined the record in this case with more than ordinary care and are of the opinion that the only reasonable inference which can be drawn from the evidence—in fact, the only inference permissible—is that the interest and welfare of the child would be best promoted by leaving it in the care and custody of appellants.

The judgment is reversed, with directions to the trial court to modify the findings heretofore made and filed in the cause, vacate the decree, and to make findings and enter a decree in accordance with the views herein expressed. Appellants to recover costs.

FRICK, C. J.

I concur. The case belongs to that class which involves questions that cannot be too carefully considered by the courts, and which, because of its character, should be determined in accordance with the facts and circumstances surrounding the individuals whose rights and interests are affected, and, when the interests are fully and fairly considered, those which affect the welfare of the child should ordinarily control in

the final determination of the action. No hard and fast rule can therefore be laid down which shall control all cases. I am convinced that the mother of the child in question here intentionally and without adequate cause surrendered it to the custody and care of others, and, further, that she did so to further her own personal ends and aims in life. A careful reading of the record prevents me from arriving at any other conclusion. I say this without any feeling against the mother. While I am in sympathy with her motherly instincts which prompt her to regain custody and control of her child, I nevertheless cannot overlook the best interests and rights of the child and of those who have freely, voluntarily, and in the most generous manner provided and cared for its wants and welfare. The affections of the child have now become entwined in those of its foster parents. To now permit the mother to take the child could only result in opening up wounds that better remain closed. It must also result in disturbing the peace of mind of the foster parents, and, in view of the past disposition of the mother's present husband, subject the child to new and untried influences that I am not at all convinced are as certainly beneficial to its best interests and welfare as are those which surround it now, and which, so far as can be ascertained from the record, will, through all the years of the child's minority at least, continue to surround it. Suppose the mother should again meet with misfortune such as in her judgment would be sufficient to justify her to abandon the child, would she not again abandon it precisely as she did to further her own welfare? Under such circumstances, the sympathy that we naturally entertain for the mother should not be permitted to sway our judgment. In view therefore that the mother has surrendered her natural or legal right to the exclusive custody and control of the child, this court has but one duty to perform, and that is to protect the best interests and welfare of the child. This, in my judgment, can only be accomplished by rendering the judgment outlined by my Associate, Mr. Justice Mc-Carty.

STRAUP, J. (dissenting).

I dissent. I think the findings of the lower court: (1) That the pleaded relinquishment was not the free and voluntary act of the mother; (2) that she is a fit and proper person to have the custody of the child, and is able to maintain, support, and educate it; (3) and that it is to the best interest of the child to permit the mother to have the custody of it —are all supported by sufficient evidence. And it being clearly shown, and substantially without conflict, that the mother is in all respects a fit and proper person to have the custody of her child, and is able to care for it, I think all doubts, if any, with respect to all other questions involved, should be resolved in her favor.