[No. 31903. *En Banc.* December 26, 1952.]

THE STATE OF WASHINGTON, *on the Relation of Hjordis
Michelson, Plaintiff*, v. THE SUPERIOR COURT FOR
KING COUNTY, *William G. Long, Judge,
Respondent.*[1]

*Reischling & Chan,* for relator.

*Charles O. Carroll* and *V. D. Bradeson,* for respondent.

[1]Reported in 251 P. (2d) 603.

GRADY, J.—This proceeding is before the court upon a writ of review and the return thereto made by the superior court of Washington for King county.

On December 11, 1950, the court made an order permanently depriving the parents of Kristopher Jones, a minor, of any and all parental rights in or to the child, and directed that he be and remain a ward of the court in the temporary custody of the Catholic Charities of the Diocese of Seattle. The relator, Hjordis Michelson, the maternal grandmother of the child, sought his custody, but because of the condition of her health it was not deemed advisable that such an award be then made. The court continued the hearing of the proceeding until June 29, 1951. The purpose of the continuance of the hearing was to enable relator to make a showing to the court of such improvement in her health and ability to care for the child as might justify it in awarding his custody to her.

On May 16, 1951, a petition was filed in the welfare proceeding which alleged that a clinical report showed relator was afflicted with active tuberculosis. The court was requested to make inquiry and to enter such order as it deemed proper for the welfare of the child. Notice of hearing upon the petition was given to relator. On the return day, she appeared in court and was represented by counsel. The court made a very complete inquiry into the health condition of relator and her capacity and ability to care for the child for the purpose of determining whether his welfare would best be served by awarding his custody to her or to the Catholic Charities in order that he might be placed for adoption. The court found that relator was a woman of unquestioned integrity and high moral character, that she had great love for the child and to deny her application for his custody would cause her deep grief. The view was expressed that it was the duty of the court to do that which it deemed for the best welfare of the child, and in such endeavor the court must lay aside natural instincts and face the facts realistically.

The court found that relator was fifty years of age. Since about 1932, she had been under the care of a tuberculosis

clinic. Her disease was considered to be arrested in 1949, but sanitorium care was advised. The court further found that relator was suffering from a low grade, active pulmonary tuberculosis, and, though she had gained weight in the past two years, the general involvement of her lungs had somewhat increased. Experts in tuberculosis were of the opinion that in relator's present condition the child should not be in personal contact with her. The experts were unable to assure the court that she would ever recover. They expressed their opinion that there was a chance that within a year or two she *might* recover. The court further found that relator was unmarried, on public assistance, and would have to depend wholly upon her twenty-two-year-old son to furnish support money for the child. The court recognized that delay in the permanent placement of the child of the age of Kristopher Jones makes such placement progressively more difficult and expressed the view that his welfare demanded that he be adopted.

The relator contends that the trial court, in its approach to and in its consideration of the problem presented, failed to recognize her legal status created by blood relationship with reference to her grandchild. Her position is that, when the rights of the parents of the child were terminated by the judgment of the court, she became its natural guardian and entitled to its custody, and that the court erred in finding it was a dependent child when it had a grandparent able and willing to provide for its care, support and maintenance.

We have not had occasion to determine the legal status of a blood relative when the parents of a minor child have died or are permanently deprived of its custody by a judgment of the court. We did make a statement in *In re Stuart*, 138 Wash. 59, 244 Pac. 116, that we had held in *Morin v. Morin*, 66 Wash. 312, 119 Pac. 745, that grandparents had no natural or inherent right to the custody of the child. An examination of those cases will disclose that the controversy arose between grandparents and parents and the main issues determined were the fitness of the respective parties to have

the custody of the children involved. The cases are of no aid to us in a determination of the question here presented.

■ We are of the opinion that, when the parents of the child were permanently deprived of custody, its grandmother became its natural guardian and entitled to its custody if she was found to be a fit and proper person and was capable of caring for and maintaining the child.

The subject of guardianship by nature finds much conflict of authority, as stated in 25 Am. Jur. 12, Guardian and Ward, § 7:

"There is some conflict among the authorities as to whether anyone but the father or mother can properly be said to be a natural guardian. Some cases expressly hold that the parents are the only natural guardians, and that no other relation has the right to claim the guardianship of a child except by appointment, while other authorities extend the term to the next of kin, as, for instance, the grandparents of an orphan child."

The author cites a number of cases, to which we may add *Commonwealth ex rel. Stevens v. Shannon*, 107 Pa. Super. 557, 164 Atl. 352. The court in the latter case said:

"The affection of a grandparent can safely be said to be no less in depth than parental affection."

The court was of the view that the principle of natural guardianship is one designed to maintain the family structure and should be applied by the courts unless clearly inconsistent with the welfare of the child.

In Tiffany on Domestic Relations (3d ed.) 395, § 148, we find the following:

"On the death of the father, guardianship by nature passes to the mother, and, on her death, to the grandfather or grandmother or any other person who is next of kin. Prima facie, the natural guardian is entitled to the custody of the child; but there are exceptions to the rule, resulting from the doctrine that the child's welfare must be considered in awarding his custody."

The supreme court of Georgia had this to say upon the subject of blood ties:

"The law does not fly in the face of nature, but rather seeks to act in harmony with it, and to that end encourages the formation and continuance of those ties which, by the inscrutable providence of God, bind man to his own flesh." *Lamar v. Harris*, 117 Ga. 993, 997, 44 S. E. 866 (1903); *Waldrup v. Crane*, 203 Ga. 388, 46 S. E. (2d) 919 (1948).

■ In determining the welfare of a child, blood relationships properly may be considered over better financial ability to enhance the standard of living of such child, as well as other factors affecting its material well-being. However, when such a factor as the health of the grandparent as disclosed by this record confronts the court, and it is made to appear that the child cannot have the personal care and attention of the custodian or the bestowal of natural love and affection in a personal way, any preference right created by or incidental to the natural guardianship necessarily diminishes.

It appears to us that the trial judge, though perhaps not definitely defining in his own mind the legal status of a grandmother, did give it consideration, and that it was only after he reached the conclusion that her disease was incurable, or at least restoration of her health would be long deferred, that he concluded the welfare of the child demanded that it be placed for adoption.

What we have said with reference to blood relationship is limited to the situation presented by the record before us, and we do not thereby mean or intend to convey the idea that the door is open to all next of kin of a child to assert legal rights to preferential custody or natural guardianship. Such questions are left open for consideration if or when they may arise.

■ The question whether the child was "dependent" must be determined from RCW 13.04.010. As applicable to the child under consideration, it provides that a dependent child is one under the age of eighteen years

"(5) Who has no parent or guardian; or

"(6) Who has no parent or guardian willing to exercise, or capable of exercising, proper parental control; or . . .

"(8) Whose home by reason of neglect, cruelty or the

depravity of its parents or either of them, or on the part of its guardian, or on the part of the person in whose custody or care it may be, or for any other reason, is an unfit place for such child; or . . ."

When the court adjudicated that the conduct of the parents rendered them unfit to have custody of their child, it became dependent in so far as they were concerned. We need not decide whether the "guardian" mentioned in the statute includes a common-law natural guardian or that relator was entitled to notice of any proceedings affecting the child. The court acquired jurisdiction over the child when the proceeding was instituted. The relator appeared and submitted herself to the jurisdiction of the court.

■ If we concluded to decide this case upon the record returned by the trial court, a majority of the court would be inclined to affirm the judgment. However, in view of the claim made by the relator that the court did not regard her as having a preference right to custody of the child by virtue of her natural guardianship and her assertion that she will be able to submit to the court additional evidence bearing upon her improved physical condition and the probability of recovery within a reasonable time to such an extent as will make it safe for the child to live with her, we have concluded to remand the case for further consideration by the court. In the proceedings before this court, it has been made to appear that certain tubercular tests will be made in December of this year which may be of assistance in determining the condition of health of relator.

We shall not direct the nature or scope of the hearing, but leave the whole matter of trial procedure to the court. When the findings of fact are made and judgment based thereon is entered, they will be subject to the right to apply to this court for a writ of review.

Remanded for further proceedings. No costs in this court shall be taxed.

MALLERY, HILL, HAMLEY, and DONWORTH, JJ., concur.

OLSON, J. (dissenting)—I regret that I feel obliged to dissent in this case because I, too, am sympathetic with this

grandmother. The consistent interest she has shown in her grandchild is commendable. Many grandparents more fortunate than she in health and financial condition, have not responded nearly so well or at all.

Her entire situation was patiently and considerately heard by the court, and a conclusion reached which the majority would affirm on the merits. This hearing was held by the juvenile court after it had acquired jurisdiction of the child as a dependent child, that is, after the child had become a ward of the juvenile court. It was the duty of that court to provide for its ward, consistent with his best interests and welfare, according to the evidence before it. If the majority opinion means that a grandparent, despite such a hearing and proper conclusion, has a right, arising out of a natural guardianship or otherwise, to have the custody of that ward, it creates a new right which neither the legislature nor any previous decision of this court has recognized.

Relator is not the legal guardian of the child. Her designation as his natural guardian can have no determinative significance in the creation of her legal right to his custody, or bring her within the statute quoted by the majority. RCW 13.04.010 [cf. Rem. Rev. Stat., § 1987-1].

The opinion of the majority may be taken to mean that, in the future, whenever the juvenile court has to provide for the custody of its ward, notice must be served upon the ward's grandparents. This must be so, if they have a preference right to the ward's custody. A preference right must mean a legal right. A legal right must be a right which cannot be foreclosed, except by the traditional requirements of notice and hearing. The legislature, in the juvenile court law or elsewhere, has not intimated such a requirement for grandparents, or for any other relative or next of kin of a ward of the juvenile court, over whom it has jurisdiction as it did in this case.

Relator is the maternal grandmother of this child. His paternal grandparents have not been mentioned, and we know nothing about them. They have made no voluntary

appearance in this proceeding. Whether or not they will so appear may be a matter of speculation, but, under the majority opinion, their right to do so is not. Further, and of greater concern, is the doubt now cast upon the validity of any order entered until they either have appeared voluntarily or have had their right to the custody of the child foreclosed at a hearing of which they have notice.

A further question is posed by the creation of this new right, that is, when and how is that right terminated? This is an important inquiry because, in many cases, the welfare of the child requires that final permanent orders must be entered. This was not accomplished at the previous hearings in this case. Will it be by a further consideration of relator's fitness to have the custody of this child? If she is now no more capable in this regard than she was at the time of the first hearings, can she again successfully assert that, despite proper reconsideration of her fitness, she has a right to a further hearing? Her position after later hearings should be as sound as it was after the first hearings, if the conclusion of the majority opinion is based upon her right, rather than her fitness to have custody of the child.

A further inquiry suggested by the creation of this new right, is whether or not its possessor may be a necessary party to an adoption proceeding involving such a ward of the juvenile court. If the right exists, it will bear assertion in adoption cases because they involve the custody of the ward. This possibility is not beyond the requirements of the adoption statutes, any more than the right conferred upon the grandmother in this case is beyond the requirements of the juvenile court law. If this court can create it in one instance, it can in the other.

Consideration of these, and other, ramifications of the majority opinion is not idle. It indicates the broad and wide departure from previously accepted practice inherent in the new requirements imposed by the opinion, before effective action can be taken by the juvenile court. Whether or not such requirements are necessary or proper for the acquisition or exercise of its jurisdiction is, in any event, a problem for the legislature and not one for this court.

It might be well to be able to say that no child can be found to be a dependent child until all of his relatives have been foreclosed. It also might be well if such relatives could be held to have reciprocal obligations for a dependent child which could be enforced. But I am unable to see how either these rights or obligations can presently be asserted as sound legal propositions.

The answer seems inescapable that the trial court did all that it well could or should have done at the first hearings in this case. To require a rehearing merely because of the claimed failure of the court to express, inferentially or otherwise, that it recognized a preference right which had not then been created, and, consequently, could not have been within the knowledge of the trial court, does not solve the basic problem in this case, or point to its ultimate solution at any determinable time.

It may be that relator can now show an improvement in her health and situation, so that the court can find that an order placing her grandson in her custody will be in his best interests. I hope she can. If she cannot, then the court will have canvassed her situation a second time, and, if her rights then can be said to be terminated, it will have to exercise its best judgment again, in the performance of its most serious duty, the permanent care of one of its wards. It is to be hoped that, if his grandmother cannot have his custody, whatever is done will be done before the ward reaches the age when the incidence of adoption will scar him too deeply, or interfere with his full response to the love and affection an adoptive home can afford him.

SCHWELLENBACH, C. J., FINLEY, and WEAVER, JJ., concur with OLSON, J.