WELFARE DIVISION OF THE DEPARTMENT OF HEALTH AND WELFARE OF THE STATE OF NEVADA, Appellant, v. PATRICIA RUTH MAYNARD on Behalf of RICHARD SCOTT MAYNARD, a Minor, Respondent.

No. 5516

September 11, 1968                    445 P.2d 153

[Rehearing denied October 25, 1968]

*Harvey Dickerson,* Attorney General, *Norman H. Samuelson,* Deputy Attorney General, for Appellant.

*John J. McCune* and *Paul J. Williams,* of Reno, for Respondent.

*Bart M. Schouweiler,* of Reno, Amicus Curiae.

## OPINION

By the Court, BATJER, J.:

On January 17, 1966, Patricia Maynard, the respondent, having exclusive authority as the mother of the child, executed a relinquishment of child for adoption to the Nevada State Welfare Department.

Richard Scott Maynard, the minor child, who had been born

on September 27, 1963, was placed in a temporary foster home upon the execution of the relinquishment and he remained there until October 13, 1966, when he was placed in the prospective adopting home.

On January 30, 1967, the respondent asked for the return of the child by means of a petition for a writ of habeas corpus supported by affidavit and also petitioned for a restraining order enjoining the Welfare Department from proceeding with the adoption. Both requests were granted later that same day.

On November 22, 1967, the writ of habeas corpus was made permanent by the lower court.

1.   Although the court below found that the respondent did not excute the relinquishment document with full understanding the opposite would appear to be true. The instrument itself is clear and unambiguous and if read at all, would be nearly impossible to misconstrue. Additionally, the respondent is intelligent, informed and reasonably well educated. She is a licensed practical nurse, and the chances of an inadvertent misconstrual on her part seems remote. The following exchange between counsel for Welfare and Patricia Maynard indicates her full and complete understanding of the instrument:

"Q.   And did Mrs. Clayton then again tell you that you should consider very carefully the question of giving up Scotty and relinquishing him?

"A.   Yes, she did.

"Q.   And that was before you signed either of the papers, Petitioner's Exhibit A (the medical release) or Respondent's Exhibit 1 (the Relinquishment for Adoption); isn't that correct?

"A.   It is, yes.

"Q.   And before you signed either one of those papers you read them over, did you not?

"A.   Yes, I did."

If an intelligent, educated person actually did read those simple explicit papers, the chances of misinterpretation were nil.

The respondent also advances the proposition that the two documents she signed on January 17, 1966 (the Relinquishment for Adoption and the medical release) were contradictory and therefor mutually self defeating. She bases this argument on the fact that in the medical release instrument is found the caveat, "I understand this consent does not constitute a consent for adoption."

While agreeing that it would have been preferable to have had that part of the second agreement deleted for clarity's sake the more realistic view is that the second instrument was executed to supplement rather than to contradict the first. The second instrument simply allowed the Welfare Department to obtain medical care for the child and to place it in a foster home pending adoption. The first document is unmistakably an unequivocal consent to relinquishment for adoption. The terms of the first are not negated by those of the second.

2. The landmark Nevada adoption case is Ex parte Schultz, 64 Nev. 264, 181 P.2d 585 (1947). There, a factual situation much like the present one existed. An unwed mother executed a consent to the relinquishment of her child for adoption to the Nevada Catholic Welfare Bureau. The bureau then delivered the child to the prospective adopting parents, who thereafter began adoption proceedings. Before this process could be completed the mother filed a writ of habeas corpus asking that the relinquishment be revoked and that she be allowed to reclaim the child. In finding the relinquishment irrevocable the court held, "A decision of the principle involved in the instant case, is included in the opinion in the case of Wyness v. Crowley, 292 Mass. 459, 461, 198 N.E. 758, 759. We quote:

" 'To accede to the contention that such voluntary consent may be withdrawn would be equivalent to saying that parties may come to a court, deliberately give their assent to actions by the court in matters affecting their interests, and afterwards, at their will and pleasure, return to the court and undo what they did because on a future day they did not like it.'

"In the case of Stanford v. Gray, 42 Utah 228, 129 P. 423, 426, Ann.Cas. 1916A, 989, the court stated as follows:

" 'Ordinarily the law presumes that the best interest of the child will be subserved by allowing it to remain in the custody of the parents, no matter how poor and humble they may be, though wealth and worldly advancement may be offered in the home of another. Where, however, a parent, by writing or otherwise, has voluntarily transferred and delivered his minor child into the custody and under the control of another, as in the case at bar, and then seeks to recover possession of the child by writ of habeas corpus, such parent is invoking the exercise of the equitable discretion of the court to disrupt private domestic relations which he has voluntarily brought about, and the court will not grant the relief, unless upon a hearing

of all the facts it is of the opinion that the best interests of the child would be promoted thereby.' "

Continuing to quote from the Schultz case, at 272:

" 'It is apparent that if in particular cases the unstable whims and fancies of natural mothers were permitted, first, to put in motion all the flow of parental love and expenditure of time, energy and money which is involved in adoption, and then, as casually, put the whole process in reverse, the major purpose of the statute would be largely defeated. * * *' " In re Adoption of a Minor, 144 F.2d 644 (1944).

"4.   Following the authorities cited above, the court finds that the relinquishment of the mother, having been freely and voluntarily given, is irrevocable * * * the document must be accorded the full effect intended under the statute.

"5.   Public policy demands that the adoption act should not be nullified by a decision that causes the public to fear the consequences of adopting a child with the full knowledge that their efforts are at the whim and caprice of a natural parent." The rule of Ex parte Schultz, supra, controls this case.

3.   After the consent to relinquishment occurred in this case the Nevada legislature amended NRS 127.080 by adding subsection 1, which reads: "The execution of a written consent to a specific adoption or a relinquishment for adoption pursuant to this chapter shall be irrevocable."

The respondent argues that since the legislature felt compelled to add this provision of irrevocability to the law, such documents must have been revocable before the amendment. Such is not necessarily the case. A statutory enactment can be simply a legislative pronouncement of already existing law. In view of Ex parte Schultz, this appears to be the circumstance here. Relinquishments for adoption have been irrevocable in Nevada at least since 1947, and the 1967 legislature merely enunciated that fact.

The lower court was in error and its order is reversed.

THOMPSON, C. J., COLLINS, ZENOFF, and MOWBRAY, JJ., concur.