359 So.2d 65 (1978)
In re ADOPTION OF Bradley Joel MULLENIX.
No. FF-321.
District Court of Appeal of Florida, First District.
June 8, 1978.
*66 James R. McAtee, Pensacola, for appellant.
James M. Weber, of Beggs & Lane, Pensacola, for appellee.
BOYER, Judge.
Puente, the putative father of a child born in the State of California to an unwed mother, here appeals a final judgment permitting the adoption of that child, over appellant's objection, by appellees, who were petitioners in the trial court.
The natural mother stated, when she placed the child for adoption, that the factors influencing her decision were: "father unwilling to marry and I have no means to support the baby. I felt adoption would be best for the baby and its future happiness." Following a favorable study by the Division of Family Services the child was placed in the home of the adoptive parents, who paid all of the medical expenses incident to the birth of the child. They have been married since 1967 and are both employed by the Pensacola Christian College. No question is raised as to their fitness as adoptive parents. Appellant, the putative father, is 22 years of age, single, employed as a welder and resides with his mother and step-father in the State of Texas. Both he and the natural mother are Mexican-Americans of the Catholic faith. He testified that he had known the child's mother for five years and that they had planned to marry in April of 1975 when she discovered that she was pregnant. They discussed the situation and agreed that they could not go through the ordinary church wedding ceremony. He talked with her by telephone the next day and she expressed a desire to be married that very day. He explained to her that it was not possible in Texas to be married in one day and that in any event he couldn't get off from work. She became very upset and that was the last time he talked with her. Appellant further testified that he definitely had intended to marry the child's mother and had started looking for a house but did not talk to his priest until after the baby was born. Two weeks after learning that she was pregnant the mother left Texas without telling the father where she was going. He made no attempt to see her or talk to her during that two week period *67 because, he testified, she was living with her sister and brother-in-law both of whom were antagonistic toward him. Appellant's mother made an offer to the sister to pay part of the expenses during pregnancy but the sister refused, stating that "they didn't need any money". Appellant and his mother made several calls attempting to locate the child's mother, all of which were fruitless. He first learned of the child's birth when he received a letter from the attorney for the adoptive parents seeking his consent for the adoption. He testified that on advice of his Texas attorney he did not send any money to the child or the mother after he learned of its birth and whereabouts. He and his mother both testified that if he was given custody of the child his mother would take care of it during the day while he was working and that the child would live with him and the child's paternal grandparents in a large farm house and would have his own room.
Appellees testified that they loved the child as if it were their own and that they had created a strong family relationship with it. Several other witnesses testified to the good relationship between them and the child.
In the final judgment here appealed the trial judge found: "that petitioner's have established a family relationship with the minor child sought to be adopted; a family unit exists; petitioners are fit and proper persons to adopt the minor child sought to be adopted; that the best interest and welfare of the child will be promoted by the adoption; that the child is suitable for adoption by petitioners; that damaging effects would be suffered by the minor child if his family relationship were changed; and that the relief requested by respondent should be denied * * *".
Appellant, relying on Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), contends that the parental rights of an unwed father cannot be terminated without proof of unfitness; that although his procedural due process rights were met by affording him a hearing, he has been denied substantive due process by the termination of his parental rights in the absence of proof of unfitness; that there was no proof nor finding that he was an unfit parent and that therefore failure to obtain his consent for the adoption and failure of proof of unfitness invalidates the final judgment of adoption.
Discussing Stanley v. Illinois, supra, the United States Supreme Court, in Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), said:
"In Stanley v. Illinois, [citation omitted] this Court held that the State of Illinois was barred, as a matter of both due process and equal protection, from taking custody of the children of an unwed father, absent a hearing and a particularized finding that the father was an unfit parent. The Court concluded, on the one hand, that a father's interest in the `companionship, care, custody and management' of his children is `cognizable and substantial,' [citation omitted] and, on the other hand, that the State's interest in caring for the children is `de minimis' if the father is in fact a fit parent, [citation omitted]. Stanley left unresolved the degree of protection a State must afford to the rights of an unwed father in a situation, such as that presented here, in which the countervailing interests are more substantial." (98 S.Ct. at p. 551).
In Quilloin v. Walcott, supra, the husband of the natural mother of the child was permitted to adopt the child although the putative father, who had never been married to the child's mother, was not found to be an unfit parent. Under the then existing Georgia law a child born in wedlock could not be adopted without the consent of each living parent who had not voluntarily surrendered rights in the child or had been adjudicated an unfit parent. Divorced or separated parents nevertheless were permitted to veto an adoption. In contrast, only the consent of the mother was required for adoption of an illegitimate child. To acquire the same veto authority possessed by other parents, the father of a child born out of wedlock was required to legitimate the child, either by marrying the mother *68 and acknowledging the child as his own, or by obtaining a court order declaring the child legitimate and capable of inheriting from the father. Until the child was legitimated, the mother was the only recognized parent and was given exclusive authority to exercise all parental prerogatives, including the power to veto adoption. The trial court determined that the proposed adoption was in the best interest of the child and that the legitimation or visitation rights requested by the putative father would not be to the child's best interest. Both were consequently denied. Upon reaching the United States Supreme Court, that Court stated the issue to be:
"Thus, the underlying issue is whether, in the circumstances of this case and in light of the authority granted by Georgia law to married fathers, appellant's interests were adequately protected by a `best interests of the child' standard. We examine this issue first under the Due Process Clause and then under the Equal Protection Clause." (98 S.Ct. at page 554).
Holding that the father's substantive due process rights were not violated by application of the "best interests of the child" standard the court said:
"We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected. [citations omitted] `It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder'. [citations omitted] And it is now firmly established that `freedom of personal choice in matters of * * * family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment." [citation omitted]
"We have little doubt that the Due Process Clause would be offended `[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.' [citations omitted] But this is not a case in which the unwed father at any time had, or sought, actual or legal custody of his child. Nor is this a case in which the proposed adoption would place the child with a new set of parents with whom the child had never before lived. Rather, the result of the adoption in this case is to give full recognition to a family unit already in existence, a result desired by all concerned, except appellant. Whatever might be required in other situations, we cannot say that the State was required in this situation to find anything more than that the adoption, and denial of legitimation, was in the `best interests of the child.'" (98 S.Ct. at pages 554 and 555).
Addressing the equal protection issue the court said:
"Appellant contends that even if he is not entitled to prevail as a matter of due process, principles of equal protection require that his authority to veto an adoption be measured by the same standard that would have been applied to a married father. In particular, appellant asserts that his interests are indistinguishable from those of a married father who is separated or divorced from the mother and is no longer living with his child, and therefore the State acted impermissibly in treating his case differently. We think appellant's interests are readily distinguishable from those of a divorced father, and accordingly believe that the State could permissively give appellant less veto authority than it provides to a married father." (98 S.Ct. at page 555).
We conclude, therefore, that appellant's reliance on Stanley v. Illinois, supra, as expanded by Quilloin v. Walcott, supra, is misplaced and that his constitutional attack is without merit.
We turn now to the statutory law of Florida to determine whether, under that law as it now exists, an adoption of an illegitimate minor child may be granted over the objection of a nonconsenting father who is not married to the mother of *69 the child and who has not been found to have abandoned the child nor to be an unfit parent. (See Turner v. Adoption of Turner, 352 So.2d 957 (Fla.1st DCA 1977))
F.S. 63.062, Florida Statutes 1975, requires as a condition precedent to adoption, the consent of the father of a minor child if:
"1. the minor was conceived or born while the father was married to the mother.
2. the minor is his child by adoption.
3. the minor has been established by court proceeding[s] to be his child.
4. he has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor and has filed such acknowledgment with the Bureau of Vital Statistics.
5. he has provided the child with support in a repetitive, customary manner."
The record does not reveal appellant to be within either of those five categories. Accordingly, his consent was not required.
It is clear that appellant was given notice of the adoption proceedings, was afforded an opportunity to be heard and, indeed, was heard. His procedural due process rights were not therefore violated. Neither was he deprived of substantive due process nor equal protection. (Quilloin v. Walcott, supra) The statute (F.S. 63.062, Florida Statutes 1975) does not require appellant's consent on the state of the record in this case. We are not, therefore, concerned with waiver of consent, viz: F.S. 63.072, Florida Statutes 1975. (See Turner v. Adoption of Turner, supra) We conclude, therefore, that the learned trial judge did not err in applying the "best interests of the child" standard.
AFFIRMED.
MILLS and ERVIN, JJ., concur.