## CHARTIER v. JOHN DOE, et al.

Case No. 84-10312-CA-20

Sixteenth Judicial Circuit, Monroe County

May 13, 1985

### APPEARANCES OF COUNSEL

**Alfred O. Bragg, Cunningham, Albritton, et al.** for defendant.

**Alfred Gustinger, Jr.,** for petitioner.

### OPINION OF THE COURT

J. ALLISON DEFOOR, II, Acting Circuit Judge.

#### Introduction

This case involves a Petition to Vacate a Consent given by the natural mother in an adoption. The Court begins its discussion by frank admission that this has been the most agonizing matter ever to come before the Court and were it ever to see another such case, it would be too soon. The Court has spent many hours in a meticulous review of the facts of the case, research into the law (not only in

Florida but in virtually every American jurisdiction with case law on point, *see generally*, 50 A.L.R.3d 918) and in somber and prayerful reflection. The Court is painfully aware that, whichever way it rules, lives will be hurt, and this specter has haunted the Court as it has deliberated. The Court now fully understands the theme which the Court found in many cases in this vein, summed up by our Supreme Court in the case of *In Re Adoption by Cox*, 327 So.2d 776 (Fla. 1976):

> It is frequently said that contested adoptions are the most difficult of all cases for trial judges. . . . We recognize the difficulties inherent in making a decision in . . . these emotionally charged matters.

*Id.*

### Petitioner's Contentions

Petitioner (hereafter Chartier) has raised a plethora of points in seeking to vacate her consent and stop the adoption process. Some she raised by means of her sworn Petition in this case, while others were raised at pretrial and at trial (though no amendment of pleadings was requested by petitioner). The Court, in an attempt to make sure that any and all issues which are even possibly related are resolved at this time, has chosen to address all of the issues raised by petitioner at any point in the process. The issues factually raised may be segregated into seven categories:

1. Chartier claims that the consent must be vacated because the natural father did not consent with her to the adoption of the child. This argument was asserted by counsel but was not raised in Chartier's petition.

The next category of claims by Chartier involves some seven different subheadings, all of which Chartier claims constitute fraud, duress and misrepresentation sufficient, both individually and collectively, to make her consent involuntary in nature. They are as follows:

2. Chartier contends that the representatives of Health and Rehabilitative Services did not advise her of all the options available to her other than to put her child up for adoption, specifically counselling or additional government aid in the form of money, or fully explore family options of support.

3. Chartier next contends that the threats of the natural father overcame her will and robbed her of her volition in the giving of the consent.

4. Chartier next contends that the threats of retaliation from the

**9**

housing authority officials whom she alleges were in league with the adopting parents overcame her free will and were intended to do so.

5. Next Chartier contends that she was affirmatively misled by the representatives of Health and Rehabilitative Services prior to giving her consent to believe that she had either thirty or ninety days to vacate consent after the birth of the child and the signing of the consent. Curiously, this contention was not raised in Chartier's original sworn petition, but was embraced by Chartier by the time of trial.

6. Chartier's original petition contended that instead of the misrepresentation coming from HRS that Tom Wright, who acted as intermediary in this cause, had misrepresented to her at the hospital that she had ninety days to vacate her consent.

7. Finally, petitioner claims that due to medication and emotional distress at the hospital she was in such a condition as to not be capable of rendering a valid consent due to lack of understanding.

## Discussion

1. The contention of the mother that the consent of the natural father must be secured prior to perfecting consent for adoption in this case is the most easily resolved by the Court. Fla. State. section 63.062 discusses the requirement for the consent of the father to the adoption of a minor.[1] It is not contended by Chartier that any of the statutory

---

[1] Fla. Stat. Section 63.062 (1984) provides:

Persons required to consent to adoption.

(1) Unless consent is excused by the court, a petition to adopt a minor may be granted only if written consent has been executed after the birth of the minor by:

(a) The mother of the minor.

(b) The father of the minor, if:

1. The minor was conceived or born while the father was married to the mother.

2. The minor is his child by adoption.

3. The minor has been established by court proceeding to be his child.

4. He has acknowledged in writing, signed in the presence of a competent witness, that he is the father of the minor and has filed such acknowledgement with the vital statistics office of the Department of Health and Rehabilitative Services.

5. He has provided the child with support in a repetitive, customary manner.

(c) The minor, if more than 12 years of age, unless the court in the best interest of the minor dispenses with the minor's consent.

(2) The court may require that consent be executed by:

(a) Any person lawfully entitled to custody of the minor; or

(b) The court having jurisdiction to determine custody of the minor, if the person having physical custody of the minor has no authority to consent to the adoption.

(3) If the minor has previously been permanently committed to a licensed child-placing agency or the department, consent may be given by the licensed child-placing agency or the department, to which the minor has been so committed, and this consent is sufficient.

10

criteria are present in this case, but rather it is asserted that in all cases consent of the father must be secured. The Florida Statute is quite explicit and the Court specifically finds from the facts presented that none of the statutory criteria for the consent of the father where the father and mother are unwed at the time of the birth are present. There is no general requirement at law in such circumstances for the consent of the natural father. *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *In Re Adoption of Mullenix*, 359 So.2d 65 (Fla. 1st DCA 1978).

2. Petitioner Chartier's claims that the HRS representatives had a duty to counsel with her concerning available alternatives to adoption are rebutted both factually and legally. Factually it is apparent from the record that the defendant was extremely knowledgeable as to the availability of publicly paid support for her needs. She had availed herself of government-sponsored programs providing food stamps, public housing, aid to families with dependent children, and government sponsored legal services through the Legal Services of the Florida Keys. The record also reveals that Ms. Chartier was of above average intelligence, and was a graduate of an apparently high-quality prep school in Chicago, Illinois, though apparently she had not chosen to go further upon this excellent educational base. The Court accordingly concludes that Ms. Chartier was both intelligent and knowledgeable as to the alternatives available to her. The Court notes further that legally there is no requirement known under any existing Florida Statute or case law on point in Florida, the Court does note the case of *Kane v. The United Catholic Social Services of Omaha, Inc.*, 187 Neb. 467, 191 N.W.2d 824 (1971), wherein the Court confronted this issue. The Nebraska Supreme Court in this case concluded "the law places on the placement agency no such obligation". 191 N.W.2d at 825.

2a. As a subcategory properly included under this heading, counsel for Petitioner Chartier did note that among the things HRS should have done was to secure legal representative for Chartier. Counsel for Chartier variously contended that Chartier thought Wright was her attorney, and that she had no attorney at all. Wright's testimony was that he served only as a middle man and anticipated not representing

---

(4) A petition to adopt an adult may be granted if:

(a) Written consent to adoption has been executed by the adult and the adult's spouse, if any.

(b) Written consent to adoption has been executed by the natural parent or parents, if any, or proof of service has been filed, showing notice has been served on the parent or parents as provided herein.

11

Chartier's interests in this matter. The Court notes from the record that, in any event, Chartier was also represented by Jeannie Elias of Legal Services of the Florida Keys during the entire time, from the time of conception to the time of filing of this litigation. At no time did Chartier question Mr. Wright or Ms. Elias as to her legal rights generally, or as to the supposed period for revocation which she may have believed that she had. The Court does not believe again that HRS has any obligation to provide counsel in these circumstances, and of all of the lawyers with whom Chartier came in contact, significantly, she inquired of none of them as to her rights.

3. The petitioner's assertions that the threats of the father overcame her free will with regard to her consent in the matter are again rebutted both factually and legally. Factually, it appears that her concerns were one of the factors present at the time of the initial interview with Lynn Wilson of HRS at the time that Chartier discovered that she was pregnant. Wilson's testimony was that while this was a factor in the discussions they had, it was not articulated as anything other than one of the factors giving rise to Chartier's desire to put the baby up for adoption. The overriding factors according to Wilson's testimony were Chartier's general circumstances and lack of ability of provide for the child. In any event, the father had been removed from the scene by the time the final consent was given in this case at the time of the birth of the child. There further is no indication that the form of this alleged duress ever focused itself. The "duress" seems to have consisted of Art's being a bad person (that is to say excessive drinking, domestic violence and general violations of the law in the Marathon area of a relatively petty nature). There is no indication from the testimony that there was ever any specific intent by Art in his behavior to cause her to do or not to do anything as a result of that behavior, and further, there was no testimony from Chartier herself that his behavior caused her to do or not do anything with respect to the consent which she gave in this cause. Accordingly the Court finds that the actions of the father in this cause did not constitute duress against Chartier both as a matter of fact and a matter of law. *See generally, Hall v. Department of Adoptions,* 47 Cal.App.3d 898, 121 Cal. Rptr. 223 (1975).

4. Chartier's allegations that she was under duress from the Housing Authority are factually unsupportable. Both the testimony of Chartier and her close friend Roetemeyer were to the exact opposite of her contention. While Chartier would contend that the officials at the Housing Authority were in league with the adoptive parents to threaten her with eviction should she not go through with the adop-

tion, both Chartier's and Roetemeyer's testimony was that the Housing Authority officials were supportive of Chartier to the extent even of trying to keep incidents which might have been lawful cause for eviction out of her records at the Housing Authority office.

Alternatively, Chartier has implied that the Housing Authority sought to get rid of the natural father in order to frustrate possible reconciliation that might cause Chartier not to go through with the adoption. The only testimony on the record was that the Housing Authority was concerned with his behavior and that the source of this concern was his lawlessness, drunkenness and incidents of domestic violence. In this concern, the Housing Authority acted lawfully and in comportment with its rules and regulations. The Court seeks no evidence of any conspiracy in this regard and believes that the Housing Authority acted lawfully and with good motives. *See Spillers v. Five Points Guaranty Bank*, 335 So.2d 851, 852 (Fla. 1st DCA 1976); *Scutti v. State Road Department*, 220 So.2d 628, 630 (Fla. 4th DCA 1969); *Corporacion Peruana de Aeropuertos y Aviacion Commercial v. Boy*, 180 So.2d 503, 505 (Fla. 2d DCA 1965).

5. Next, Chartier contends that she was misled by HRS representatives and Tom Wright[2] as to whether or not she could at a subsequent time vacate the consent to the adoption. If one believes Chartier, she *may have* been laboring under a misapprehension as to her legal rights. The question is from what source did this misapprehension spring - an external one (HRS and/or Tom Wright) or from her own mind. Lynn Wilson's testimony was to the effect that she explained at the beginning of the process that led to the adoption that there were two types of adoption, private placements in which the consent could not be set aside and agency placements in which there was an intervening time period. It may be from this initial conversation that Chartier's confusion arises. However, this confusion arises only in her mind, not as a

---

[2] In her original sworn petition, Chartier asserted that Wright made such statements to her. Counsel for Chartier made some very strong statements about Mr. Wright's actions in this regard. At the time of trial, Chartier's testimony was only as to Lynn Wilson's statements, a curious switch. This may have evolved from an intervening occurrence wherein it was discovered that Wilson had falsely testified under oath as to the contemporaneous nature of her records under pressure from superiors to "get her records in order". Her testimony, while false, was trivial and perhaps a predictable bureaucratic response. In any event, she "came clean" by the time of trial, and was found in contempt of court and fined $500.00 for her actions. This, however, presumably left her a better target for allegations of impropriety.

In any event, the Court notes for the record that Mr. Wright is a lawyer of integrity and honesty. He does not lie. The Court believes that Chartier's counsel owes Mr. Wright an apology.

**13**

result of any statements by the HRS representatives. Further, the Court notes that this claim was not presented in Chartier's original sworn petition setting forth the facts in this case. The Court notes this to be a curious omission and a telling one. With regard to any misrepresentations by Wright as previously noted, she never even inquired as to this point in her discussions with him or the numerous occasions in which she appeared at his office to receive money during the pregnancy for the prenatal care of the child. The testimony from Wilson, Wright's secretary and Wright as to the statements made at the hospital clearly reflect that Wright at no time made such a statement to Chartier, and further that he both read her the consent form and allowed her to read it. The consent document itself is clear and unambiguous as to its constituting a complete relinquishment of all rights over the child.

It is apparent, however, that after the consent to the adoption of the child the HRS representative Wilson did become aware that Chartier was laboring under the false impression that she could set aside the consent which she had previously given. It is also clear from Wilson's testimony and from Chartier's testimony that Wilson allowed her "client" to labor under this illusion and did nothing to dispel it. The post-consensual nature of this action renders it legally meaningless, but the Court is shocked that an employee of HRS placed in such a situation would act in so cavalier a fashion and would not immediately have sought to make sure that her charge understood the true facts of the situation. The Court finds that these actions by HRS are shocking, reprehensible and recklessly irresponsible, though they have no legal effect in this case.

6. There is conflicting testimony as to the effect on Chartier of medication which she took at the time of the birth of the child and whether or not this robbed her of her ability to understand the irrevocable nature of the consent which she executed. Chartier contends that she was highly distraught and medically sedated to the point of not being able to render a legally binding irrevocable consent to the adoption. She is supported in her contention by the testimony of an "expert", Dr. Morse from Miami. Dr. Morse's conclusions are based upon the review of the medical records in the case in question and the Court notes that he appears as a hired expert witness for that purpose.

Chartier's contention is directly rebutted by the testimony of both the parties who were present at the time of the signing of the adoption and a medical doctor who spoke with her both the night before and the morning of the consent and subsequently reviewed the file with regard to the medical effects of the drugs she was taking. The lay witnesses at

14

the time of the consent are unanimous in their conclusions that Chartier was lucid and alert, though somehwat subdued, which is somewhat understandable under the circumstances. They related, contrary to her assertions that she was highly distraught and almost hysterical, that she was able to sign the document, that she in fact read it herself, and that one tear appeared to escape her eye.

Dr. Claudia McEwen testified that she spoke with Chartier the evening before in trying to make sure that her state of mind was clear with regard to going through with the adoption. She testifies that she saw her the next morning with the same intent, and that on both occasions she appeared lucid and coherent and totally aware of the circumstances in which she found herself. She testifies further that upon a review of the medication which Chartier was receiving that it would have had no effect on her mental acuity. The Court clearly defers to the expert medical testimony of a doctor who had occasion to examine the patient, particularly when supported by three lay witnesses, one of whom is a lawyer, over the speculative testimony of a hired gun. The failure of Chartier to manifest any outward manifestations of any reservations is consistent with her conduct throughout the pregnancy. At all times, her actions manifested an intent to permanently give up the child. This feeling is even reflected in the hospital records, and her regret at the time of signing the consent.

There are entries in both the "Patient Care Notes" and "Patient Care Plan" in the file from the Hospital which reflect statements she made to the nurses regarding her emotional state. These entries reflect the fact that Chartier was depressed at giving her baby up for adoption. In them, Chartier refers to the adoption as an accomplished fact. In the "Patient Care Notes", she states to the nurse that she hates to give up "her little girl", but goes on to say that the baby will have a better life if it is not raised with "babysitters". According to the Patient Care Plan, she was going to go home and "[a]accept [the] loss" of her baby. Yet nowhere is there anything to indicate that Chartier expressed to the nurses any assumptions she may have harbored concerning the legal effect of the consent. Nor did Chartier ever intimate to Dr. McEwen that she believed the consent revocable. Dr. McEwen had no fewer than three conversations with Chartier during her stay in the Hospital. In each of them, she tried to determine whether the surrender of the baby came as a product of sober reflection. Dr. McEwen testified that Chartier was depressed, but that at the same time she considered the adoption to be in the best interests of the baby. Dr. McEwen also testified that not once did Chartier say that she considered the surrender of the baby revocable.

Moreover, if the surrender was revocable, why would Chartier have been depressed? Why would she have cried upon signing the consent if she did so on the assumption that she could retract it? Why would she have made the statements she made to the nurses? The probable explanation is that during the interval between her departure from the Hospital and the day she first broke silence to Roetemeyer, she formed a *post hoc* rationalization for what she had done. Indeed, all of her own witnesses' testimony refers only to her articulating the idea of revocability of consent after the execution of the consent. Absent compelling evidence that the natural mother harbored the misconception at the time she surrendered the baby, the courts have lent little credence to allegations made after the fact that someone misrepresented the legal significance of the consent. *See Department of Health & Welfare v. Maynard*, 84 Nev. 525, 445 P.2d 153, 154 (1968); *Mabbitt v. Miller*, 246 Iowa 712, 68 N.W.2d 740, 742-43 (1955); *In Re Adoption of Baby Girl K*, 26 Wash. App. 897, 615 P.2d 1310, 1315 (1980); *Davis v. Turner*, 337 So.2d 355, 359 (Ala. Civ. App. 1976) *cert. denied*, 337 So.2d 362 (Ala. 1976); *In Re Adoption of Pitcher*, 103 Cal. App.2d 859, 230 P.2d 449, 450 (1951). No one tricked Ms. Chartier into doing anything. Indeed, all the evidence from responsible witnesses is to the contrary.

## Findings of Fact and Conclusions of Law

1. The father's lack of consent to the adoption is of no effect. Fla. Stat. Section 62.062 (1984); *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); *Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); *In Re Adoption of Mullenix*, 359 So.2d 65 (Fla. 1st DCA 1978).

2. Chartier was an intelligent, reasonably well-educated mother aware of resources available to her from public agencies and her family.

3. The failure of the HRS to advise her as to alternatives to adoption or to provide legal counsel are of no consequence, as no obligation to do so exists at law. *Kane v. The United Catholic Social Services of Omaha, Inc.*, 187 Neb. 467, 191 N.W. 2d 824 (1971).

4. Chartier had available to her legal counsel without charge both from Legal Services and, if asked, from Mr. Wright, as to her rights, of which she did not avail herself.

5. The actions of the father were not of such a nature as to overcome Chartier's free will and were not intended to, nor did they have, the effect of coercion.

16

6. The actions of the Housing Authority were within its legal rights, were not motivated by any conspiracy against Chartier, were an appropriate reponse to the actions of the father, and were softened to the benefit of Chartier and to her protection.

7. Chartier was not misled as to her rights by HRS or by Tom Wright as to a revocation period.

8. The post-consensual misleading of Chartier by HRS as to her rights by omission has no effect on the validity of her consent.

9. The medication which Chartier took prior to the execution of consent to the adoption was not of such nature as to affect her ability to understand the nature and effects of the consent.

10. The overall facts and circumstances reveal that Chartier, an intelligent and reasonably well-educated mother acted at all times prior to consent consistent with an intention to permanently give up all rights to her child. Further, she read and had read to her a consent form which is unambiguous in its finality.

In such circumstances, the courts have uniformly upheld such consents as irrevocable. *Grabovetz v. Sachs*, 262 So.2d 703 (Fla. 3rd DCA), *cert. denied*, 267 So.2d 329 (Fla. 1972); *Welfare Division of Department of Health and Welfare v. Maynard*, 84 Nev. 525, 445 P.2d 153 (1968). Indeed, even absent the corroborative notions of Chartier, the agreement itself would be sufficient grounds to uphold the consent. When confronted by similar facts, the Court of Appeals in Washington in *In Re Adoption of Baby Girl K*, 26 Wash. App. 897, 615 P.2d 1310 (1980), held: "One is deemed by law to understand its content if one has signed of one's own free will (voluntarily), knowing that one is signing an agreement." *Id.* at 1315.

11. The surrender of a baby for adoption is caused in the usual instance by some social or financial pressures on the natural mother. Indeed, it is a rare adoption in which this is *not* the case. These pressures come from innumerable quarters. Sometimes the natural mother suffers from an emotional disorder. *See Petition of Simaner*, 16 Ill.App.2d 48, 147 N.E.2d 419, 421-22 (1957), *affirmed*, 15 Ill.2d 568, 155 N.E.2d 555 (1959). Sometimes she is in straitened financial circumstances. *See Kane v. The United Catholic Social Services of Omaha, Inc.*, 187 Neb. 467, 191 N.W.2d 824, 825 (1971). Sometimes the natural mother surrenders the baby in order to prevent her parents from finding out that she was pregnant. *Matter of Fontaine*, 516 P.2d 1333, 1334 (Okla. 1972), *appeal dismissed sub nom.; Fortier v. Project Hope, Inc.*, 414 U.S. 806, 94 S.Ct. 72, 38 L.Ed.2d 42 (1973). Some-

**17**

times she does so from fear of the natural father. *See Hall v. Department of Adoptions*, 47 Cal.App.3d 898, 121 Cal.Rptr. 223, 227-28 (1975). Yet in each of the foregoing cases the argument of duress was rejected.

Nor is there any question that the surrender of a baby for adoption is upsetting to the natural mother. Once more, this is universal. *See In Re Surrender of Minor Children*, 344 Mass. 230, 181 N.E.2d 836 (1962). There the Supreme Judicial Court of Massachusetts stated:

> Contemplation of the surrender of one's own child is in many, if not all, cases a cause of emotional and mental stress. Many such surrenders are undoubtedly by mothers of children born out of wedlock and are contemplated because the trying circumstances tend to show that the welfare of the child calls for action at variance with that dictated by natural instincts of maternal love and affection. No statute has said that surrenders are valid only if executed free from emotion, tensions, and pressures caused by the situation. No principle of law requires the rule. A balance of the interests of the persons concerned and of society weighs strongly against it.

181 N.E.2d at 839. *See also People ex rel. Drury v. Catholic Home Bureau*, 34 Ill.2d 84, 213 N.E.2d 507 (1966). There, in language which could be transposed onto the present situation, the Supreme Court of Illinois further described the realities of the situation. It stated:

> Admittedly, a mother's decision to consent to her child's adoption by a couple to her unknown must be a most difficult one to make. Strong emotional factors militate against it. Once done, misgivings not only may occur, but are probable, and it is not unlikely that attempts to rescind such consent will be made at a time when the child has been placed in an adoptive home, and new attachments formed.

213 N.E.2d at 512. Yet in neither of these cases did the emotional cross-currents which attended the surrender of the baby for adoption rise to the level of duress.

There have been a number of instances in which the natural mother of an infant has tried to vacate a consent to adoption due to the alleged influence of medication at the time she gave it. In not one of them were the effects of recent medication deemed sufficient to vitiate the consent, either standing alone or in combination with other circumstances. *See Application of Hendrickson*, 159 Mont. 217, 496 P.2d 1115, 1118 (1972); *Bidwell v. McSorley*, 194 Va. 135, 72 S.E.2d 245, 247 (1952); *Regenold v. Baby Fold, Inc.*, 42 Ill.App.3d 39, 355 N.E. 2d 361, 363 (1976); *Anonymous v. Anonymous*, 23 Ariz.App. 50, 530

18

P.2d 896, 897 (1975). Here the evidence was uncontradicted that the effects of the medication on Chartier were not even discernible to those who were with her that day, one of whom was a trained medical observer.

At one time or another, Chartier tried to base her duress arguments on the presence of all of the foregoing circumstances. As the authorities *supra* demonstrate, these circumambient pressures affect many contested adoptions in one combination or another. The natural mother may be scared of the natural father, as in *Hall*. She may be penniless and uninformed of her options, as in *Kane*. She may be trying to flee parental disapproval, as in *Fontaine*. She may be under mild medication. Yet none of these pressures give rise to duress in these cases, or in others too many to enumerate here.[3] Then too, the feelings of remorse attending the voluntary placement of a baby for adoption are universal. That does not give rise to duress or prevent the adoption. If it did, a binding adoption would be a rarity. *See Barwin v. Reidy*, 62 N.M. 183, 307 P.ed 175 (1957). In *Barwin* the Supreme Court of New Mexico stated: If consents to adoption were ineffective every time this sort of duress entered the picture, it is difficult to see how any adoption where consent is required could be allowed to stand, for what natural parent would ever consent to the adoption of his or her child in the absence of duress of circumstance?

307 P.2d at 185.

12. Finally, the law is unclear as to whether the burden upon Chartier requires proof by "clear and convincing" evidence or by a preponderance of the evidence.

The Court is inclined to believe that in such cases as these the burden of proof upon the petitioner is clear and convincing.[4] However, the Court has considered Chartier's petition under both standards, and

---

[3] In *Drury, supra,* there were even grave questions going to the mental capacity of the natural mother to consent owing to her involuntary commitment for an emotional disorder following a formal adjudication of incompetence. 213 N.E.2d at 509-10. Even this did not dictate a finding of duress.

[4] Although Florida case law on the standard of proof to invalidate a consent to adoption for fraud or duress has traditionally required clear and convincing evidence, see *In Re Adoption of DeGroot*, 335 So.2d 845 (Fla. 4th DCA 1976), and *Grabovetz v. Sachs*, 262 So.2d 703 (Fla. 3rd DCA), cert. *denied*, 267 So.2d 329 (Fla. 1972), the Court is also aware of the decision by the Supreme Court in *Watson Realty Corp. v. Quinn*, 452 So.2d 568 (Fla. 1984), in which the Court ruled that fraud may be proved by a mere preponderance of the evidence. Its uncertainty as to whether *Watson Realty* extends to the withdrawal of consents to adoption is rooted in the fact that adoption cases are unique, and the stakes in them uniquely high.

for reasons amply discussed finds them insufficient under either standard. The Court has felt at times as if it were trying to put smoke in a bottle as it dealt with this broad scope of potentially intertwined allegations, and the Court has sympathy for any appellate court which must deal with them as well. As a final aside, the Court notes that almost all of the cases it has cited involve similar fact patterns, and have reached similar results. The Court notes, perhaps as much for comfort as for clarity, the astonishingly similar case of *Anonymous v. Anonymous,* 23 Ariz. App. 50, 530 P.2d 896 (1975).

## Best Interest of the Child

The Court has not discussed the best interests of the child, nor has it considered them in reaching its decision, nor does it rely upon them in making its determinations in this cause. Based on the evidence and the applicable law which has been discussed heretofore, the Court believes that Chartier's petition has not carried its burden and should be denied on this basis alone. The reason that the Court has not considered the best interest of the child is because the Court is not certain that Florida law sets forth whether or not the Court may consider this in circumstances such as these. It is unclear whether or not in the face of allegations of fraud, duress and the like the Court is able to reach the best interests of the child in making its determination.[5] The Court would be remiss, however, if it did not discuss this matter for the benefit of the District Court of Appeal should that Court feel that it is a proper factor.

If the best interests of the child are considered to be a relevant factor, it would be irrefutable that the child should remain where it is. On the one hand we have the petitioner, whose life is and continues to be in substantial disarray. While she is making admirable attempts to change her life, attending church and working, the history of domestic violence, of association with persons of disrepute (including subjecting her already-existing child to persons whom she indicated she feared personally), stands in marked contrast to the stability and security

---

[5] Most of the recent cases which have reached the Supreme Court and District Courts of Appeal have come up on actual petitions for adoption. The best interests of the child must be weighed in all such proceedings, whether contested or uncontested. Fla. Stat. Section 63.122(5). This present action is the procedural mirror image of most of the cases standing as precedent in that it is a "collateral attack" by Chartier on the consent she earlier gave. Due to the fact that Chartier offered evidence on her fitness as a mother and the Court both received that evidence and studied the home situation of the adoptive parents *in camera,* the Court has before it sufficient evidence to make this determination.

offered by the adopting parents. The review of the entire HRS file by the Court *in camera* which was accomplished at the request of Chartier's counsel, which documents have been sealed and placed in the Court file for the *in camera* consideration by the District Court of Appeal should it desire, reflect clearly that the adopting parents are stable, hardworking, middle-class, educated, concerned, loving and caring individuals.

This overall balancing is made even more acute by the effects of bonding which occur and have occurred in the brief life of this child. Dr. McEwen, qualified as an expert in pediatrics on the Court's own motion, testified that this bonding process which going on in the first fragile months of this child's life is vital to the healthy emotional development of the child. She testified further that were the child to be returned to the natural mother, its intellectual and emotional growth would be severely retarded to the detriment of the child. Were this factor to be considered by the Court to be a proper subject for consideration in cases such as these, the Court believes that it would create an overriding interest in keeping the child where it is in the absence of the clearest and most compelling reasons. This viewpoint was summed up by our own Supreme Court in the case of *In Re Adoption by Cox*, 327 So.2d 776 (Fla. 1976), in which the Court stated "[i]n this case the record reveals that the trial judge found that the child's best interest would be served by allowing the child to remain with persons she had known her entire (albeit short) life. In such circumstances we will not say that the natural mother's recantation of consent, or her fitness and desires, must prevail over the trial court's judgment to the contrary". *Id.* at 778. This viewpoint was also put forth by the Court of Appeals in Arizona in *In Re Adoption of Hammer*, 15 Ariz. App. 196, 487 P.2d 417 (1971); "[F]rom a strictly humanitarian standpoint there must be an end to the emotional stress and strain that is involved in the natural parents' attempt to regain custody of their child. This strain is particularly acute to the adoptive child itself, who may have established strong bonds of affection and love for the adoptive parents, and to the adoptive parents who must suffer the spectre of losing their child." 487 P.2d at 419. For the foregoing reasons, it is

ORDERED AND ADJUDGED that the Petition be, and hereby is denied; that the temporary restraining order heretofore entered in this action be, and hereby is, vacated; that the Plaintiff and Petitioner take nothing by this action; and that the Defendants shall go hence without day.