SHARP, Chief Judge.
The Roes, natural parents of the infant, John Doe, appeal from a judgment of adoption establishing parental rights in the Does to the child. The Roes argue that the natural mother’s consent to the adoption was obtained under duress and should be invalidated. We affirm the trial court's conclusion that the natural mother is bound by her consent. However, the Roes also argue the adoption is invalid because the natural father’s consent to the adoption was not obtained. The trial court found his lack of consent should be excused because of certain irresponsible actions on his part prior to the child’s birth, which the trial court found constituted abandonment. We reverse.
This case was tried over a period of months. It was ably and well presented by the attorneys for both sides. As do all contested adoption cases, it caused the trial judge and the appellate panel that heard it much concern, and empathy for all of the parties involved.[1]
The transcripts of testimony in the case are lengthy, and contain conflicts regarding the natural mother’s consent and the natural father’s abandonment of her and the unborn child. After this adoption proceeding commenced, the natural parents married. There are numerous discrepancies between the natural mother’s testimony at trial and the testimony concerning her prior statements to social workers, friends and professionals during her pregnancy with respect to the natural father abandoning her. In any event, there is evidence in this record to support the trial judge’s fact findings, and we are bound as appellate judges to accept them as proven.[2]

“Factual Findings of the Court

1. The natural father and mother met in Tempe, Arizona, in the summer of 1985.
2. During the course of their later relationship, the natural mother discovered she was pregnant and advised the natural father of this fact before going on a ski vacation over the Christmas break in December of 1985.
3. At the time he was advised of the natural mother’s pregnancy, the natural father had accumulated savings and, additionally, had earned commissions in the amount of $10,000 during the month of December 1985 from the sale of solar water-heating units. The natural father was also aware he would need to obtain a new job beginning in January of 1986 because the tax credits for solar equipment were being terminated by the federal government in December of 1985.
4. Knowing of the ending of his employment and being advised of the natural mother’s pregnancy, the natural father expended $4,000 on equipment and ski vacation expense.
5. In January 1986 the natural father urged the natural mother to obtain an abortion because he was not ready to commit to marriage, felt financial pressure, and was troubled by the whole idea of the pregnancy.”
“6. The natural mother responded by attempting to have third parties counsel the natural father against abortion.
7. During the time of her early pregnancy, the natural mother was living with a small son, born out of wedlock in another previous relationship, in an apartment in Phoenix, Arizona. She told the natural father she would not abort the child in útero, but that she could not raise two children as a single, unwed mother.
8. The natural mother lost her job in January of 1986, and her economic position *1039 deteriorated as the pregnancy continued.[3] The natural father, during the time he was urging the natural mother to abort the child, paid one month’s rent for her in February 1986. Some family furniture and a microwave oven were also made available to the natural mother. No further repetitive or continual support in the form of contributions toward prenatal medical expense, care, food, rent or support was forthcoming from the natural father during the balance of the natural mother’s pregnancy, which ended with the birth of a son on September 12, 1986.
9. The natural mother discussed the option of adoption with the natural father from the beginning of the pregnancy and during the entire term of the pregnancy.
10. The natural father knew from the beginning of the pregnancy that if he would not marry the natural mother, she wanted their child adopted into a loving, middle-class, Jewish home because the natural mother stated repeatedly and strongly that the child needed the stability and pre-manency [sic] of a loving, two-parent home. She was Jewish, and the natural father was not.
11. The natural father agreed to have the child placed for adoption, deferring to the wishes of the natural mother.[4] However, the natural father expressed that he did not want the child raised in a Jewish home.
12. In March 1986 the natural mother wrote a letter to the natural father’s mother, which the natural father later discussed with his mother.
13. The letter explained why the natural mother would not abort the child and why the child was being placed for adoption.”
“14. After the natural mother lost her job, she went on unemployment, received prenatal vitamins and free counseling from the Jewish Social Services in Phoenix, Arizona, and applied for other assistance, as well as receiving groceries from a local church.
15. The natural father was aware of the natural mother’s financial situation but did not offer any financial assistance for prenatal care.
16. The natural mother told her physician, mother, sister, and friend who tried to previously counsel the natural father against aborting the child, that she was going to Florida to start her life over and place the child with a Jewish family.
17. The natural mother’s mother, a resident of Tampa, Florida, contacted a local rabbi and said her daughter was pregnant and that her daughter wanted her child placed with a Jewish family.
18. The prospective adoptive parents, a middle-class, Jewish couple, residents of central Florida, husband age 36, wife age 34, have been married since 1975, and have tried to conceive a child with no success.
19. The prospective adoptive parents have placed their names with several sources of adoption and heard through friends that there was a Jewish baby available, through the source of the Tampa rabbi previously contacted by the natural mother’s mother.
20. An attorney whom the prospective adoptive parents had contacted as a source of adoption was then in contact with the natural mother’s mother, who then had the attorney call the natural mother in Arizona.
21. In a long-distance telephone call lasting over one and one-half hours, the attorney questioned the natural mother at length about her motivation for placing the child for adoption.
22. The natural mother told the attorney that the natural father had washed his hands of her and the child and had not given needed prenatal financial and emotional support; that she did not love the natural father, and that it was best for her child to be placed with a two-parent home *1040 for adoption, because the natural mother was already raising one child on her own as a single parent and she could not afford, emotionally or financially, to raise two. She was happy to learn that the attorney was in contact with a Jewish couple fitting her criteria for adoption.
23. The natural mother left Phoenix without telling the natural father. He was given a letter by the natural mother’s sister explaining why she left.”
“24. Within a matter of days, the natural mother called the natural father and told him she was in Florida.[5] She then reiterated that she was placing the child for adoption because the natural father would not marry her; she could not support two children on her own, and the child would be better off in a two-parent home.
25. The natural mother and natural father were in telephonic contact up until just before the birth of the child.
26. The subject of the phone conversations primarily dealt with the relationship of the natural mother and natural father, with the natural father urging the natural mother to come to Phoenix to have the child, live with him and give him time to sort his life out and make the ultimate decision of marriage.
27. The natural mother told the natural father she would not live with him out of a marriage relationship and repeatedly told him why placing the child up for adoption was best for all.
28. The natural father had an insurance coupon book sent to the natural mother with a letter enclosed dated August 18, 1986. The natural mother dropped a copy of the letter by the intermediary attorney’s office.
29. The letter discussed the relationship of the natural parents and also asked the mother to “at least think about” letting the natural father raise the child.
30. The attorneys concluded, based upon the lack of prenatal financial or emotional support given by the unwed father, that the natural father’s consent fit the criteria for excusal by the Court under Florida’s adoption statute. They did not contact the natural father or the prospective adoptive parents about the letter.
31. After sending the letter, the natural father and natural mother were in contact again by telephone. In the last telephonic contact before the birth of the child, the natural mother, after having heard within a short one- to two-week period the natural father say he would marry her and then say he had changed his mind and could not decide upon marriage, asked the natural father to let her make the decision. He did not say no.[6]
32. The natural mother, during the two weeks before the birth of the child, was wrestling with whether to place her child for adoption or to keep the child. She counseled with a Roman Catholic nun employed as a social worker with an Orlando, Florida center for unwed mothers, BETA House. She spoke with her mother and sister.
33. Concluding that the natural father was staying with his original position of wanting her to keep seeing him but not making a commitment to marriage and not receiving any support emotionally or financially or any offers of prenatal financial support, the natural mother contacted her physicians and asked them to induce labor.
34. In the hospital the natural mother cried and expressed concern over placing her baby for adoption, but on Sunday, September 14,1986, two days after the birth of the child on Friday, September 12, 1986, the natural mother told the attending postpartum nurse she was sure she wanted the child placed for adoption. She had previously consented to medication to dry up her breast milk, and she told the nurse at 8:30 а.m., forty-five minutes before signing the consent, to take the child back to the nur *1041 sery, that she did not want to see him anymore.
35. At 9:15 a.m. the natural mother signed the required consent, later stating she knew what she was signing, although she did not like it.
36. The natural mother called an exgirl-friend of the natural father’s on Monday, September 15, 1986, telling her of the birth of the child.
37. The natural father was called by the exgirlfriend and he then called the natural mother saying to get the child back and that he would marry her.[7] ”
In addition, the trial court found that the adoption was clearly in the best interest of this child, although it earlier disclaimed this as a consideration in determining consent issues. We agree with appellants that the best interest of the child is not a relevant factor unless the child was legally available to be adopted.[8] However, the adoptive parents have had custody of the child since its birth, and it is now over one year old. The record supports the trial court’s finding that there may possibly be serious psychological damage at this point to the child, upon being removed from the only home it has ever known.

Validity of the Natural Mother’s Consent

The trial court found that the natural mother failed to show by clear and convincing evidence that her consent was not freely and voluntarily given.
The natural mother was intelligent, articulate, and knew the consequences of signing the consent for adoption — a form the intermediary attorney had discussed with her two months before the birth of her child and that the HRS worker had reviewed with her in a meeting before having her physician induce labor. While surrender of a baby for adoption is upsetting to a natural mother, this is universal and not grounds for supporting duress.
The trial court found the natural mother gave up the baby because of generalized social and financial pressures, but that no one exerted coercion, duress or fraud to procure her consent. Absent a finding of fraud, duress, or undue influence, a natural parent’s consent to an adoption is valid and irrevocable upon execution of the written consent.[9] This same rule exists in most other jurisdictions in an effort to balance the welfare and rights of the child and both sets of parents involved in an adoption.[10] If consents to adoption were freely made voidable, the stability of adoptive families and the institution of adoption itself would be threatened.

Necessity for Natural Father’s Consent to the Adoption

Pursuant to Florida’s current statute governing adoptions (Chapter 63), the natural father’s consent to this adoption was required.[11] Section 63.062(l)(b) provides that the natural father must give his written consent following the birth of the child, if he has filed an affidavit of paternity with the vital statistics office of the Department *1042 of Health and Rehabilitative Services.[12] The natural father filed such an acknowledgment in Florida, shortly after the birth of the child and before this adoption proceeding commenced.
However, the adoption statute also provides that such consent to an adoption may be excused by the court.[13] Section 63.-072(1) specifies that consent is excusable in the case of “a parent who has deserted a child without affording means of identification, or who has abandoned a child.”
The trial court in this case found that the natural father’s consent was excused because of estoppel (i.e., he had impliedly consented to the adoption prior to the birth of the child) and he had abandoned the child by his actions and failures to act with respect to the natural mother, prior to its birth:
41. The natural father is estopped to claim his written consent is required under Florida law because his actions and communications to the natural mother and third parties show that he impliedly consented to the adoption. Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1984).[14]
42. When the natural father learned the natural mother was pregnant, he initially attempted to have the pregnancy terminated, later agreed to the child being placed for adoption, and then did nothing showing continual and repetitive prenatal support. Fla.Stat. § 63.062(l)(b)(5) (1985); Wylie v. Botos, supra; In re Adoption of Mullenix, 359 So.2d 65 (Fla. 1st DCA 1978).
43. On notice that the natural mother could not raise two children on her own because of her difficulties raising one child out of wedlock, the natural father paid no monies toward prenatal medical bills, food, or medications, and only one month’s rent. As such, there was a shirking of the responsibilities cast by law and nature. Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983); Wylie v. Botos, supra; Fla.Stat. § 63.062(l)(b)(5) (1985).
44. The Court notes that Wylie v. Botos, supra, has remarkably similar facts wherein the unwed father first ignored the fact of pregnancy, then gave initial assent to “her decision” to adopt the baby out. Shortly after the birth of the child, the unwed father and mother reconciled, decided to contest the adoption on the basis of no written consent executed by the putative father, and subsequently married. The adoption petition was granted notwithstanding the natural father’s objection and lack of written consent on the basis that the father’s pre-birth actions evidenced consent and that he was equitably estopped to claim his written consent was required.
45. In light of the fact that this newborn child was placed up for adoption by the natural mother because the unwed father had been unwilling to show meaningful support during the pregnancy, the Court considers his pre-birth conduct to be relevant to the issue of whether he gave consent, implied or otherwise, to the adoption, and is now estopped to claim his written consent is required.
[[Image here]]
49. The Court finds, by clear and convincing evidence, that the natural father abandoned the developing child by failing to provide the unwed mother with meaningful, repetitive, and customary support either during the pregnancy or at any point before the unwed mother executed the consent two days following the child’s birth. Wylie v. Botos, supra.
50. During this critical time frame, the natural father’s conduct evinced a “settled purpose” to shed himself of the responsibility presented by pregnancy. To this end he was intent upon placing his “freedom” and desires above the needs of the child developing in the natural mother’s womb. Additionally, he witheld [sic] emotional and financial support that was within his ability to give *1043 when the mother lost her job and was incurring prenatal and other expenses that were beyond her ability to pay. This Court listened with rapt concentration to the natural mother about this agonizing period; how she defended her position against the Father’s urging that she permit her unborn child to be destroyed by abortion; how she squeezed by economically, accepting welfare and the charity of others, and how in the early days of August in her 8th or 9th month of pregnancy she sought so desperately with the help of her family to replace her medical, health, and economic uncertainty and anxieties with security and direction when she finally chose the course of adoption for her unborn child and moved back to Florida. Historically, an equity Court has been concerned with unclean hands.
The key issues in this case, which are so far as we can determine ones of first impression, are whether abandonment or desertion may be used as the sole basis to excuse the necessity for consent to an adoption under Chapter 63; and whether a putative natural father can abandon his child by neglecting his responsibilities to support the natural mother during pregnancy and assist with her pre-birth medical expenses.
Adoption is a statutory creation, not existent at common law, and courts generally require strict compliance with the statute.[15] Under current adoption statutes, the trend is to give unmarried natural fathers substantive and procedural rights analogous to married fathers and natural mothers,[16] although because of the psychological and biological differences between begetting and bearing a child, no court has held that an unmarried father’s rights must be equal to the natural mother’s or even to a married father’s. See Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983); Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978); In re Adoption of Mullenix, 359 So.2d 65 (Fla. 1st DCA 1978); Department of HRS v. Herzog, 317 So.2d 865 (Fla. 2d DCA 1975).
The closest case factually to this one that we have discovered is Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1982). In Wylie, the unmarried natural father expressly agreed with the mother’s decision to have the unborn child adopted. In contrast to this case, he helped support the mother and paid medical expenses with the understanding he would be reimbursed by the adoptive parents. Not until after the child was born, the consent executed by the mother, and a petition to adopt had been filed did the natural father file his acknowledgment of paternity (some two months after the child’s birth). The Fourth District Court of Appeal held that the natural father was estopped to claim his consent was necessary under section 63.062(1). In this case, however, the natural father timely filed his acknowledgment of paternity, which triggered the necessity for his consent under the adoption statute.
In other contexts the Florida courts have required clear and convincing proof of abandonment by a parent in order to terminate his or her parental rights.[17] Proof of abandonment may be by any word, deed or course of action, from which a settled purpose to abandon can be inferred.[18] But we can find to Florida case which has based a finding of abandonment on pre-birth, laggard activity by a putative father. Other jurisdictions which have considered this issue have reached different conclusions. See In re Adoption of Nelson, 202 Kan. 663, 451 P.2d 173 (1969) (rejected view that *1044 a natural father can abandon an unborn child); Doe v. Attorney W, 410 So.2d 1312 (Miss.1982) (upheld termination of parental rights on grounds the father abandoned his unborn child); State v. ex rel. Lewis v. Lutheran So. Ser., 68 Wise.2d 36, 227 N.W.2d 643 (1975) (upheld termination of natural father’s parental rights because of pre-birth abandonment).
The only statutory definition of “abandonment” in Florida is that found in section 39.01(1), Florida Statutes (1985):
(1) “Abandoned” means a situation in which the parent or legal custodian of a child or, in the absence of a parent or legal custodian, the person responsible for the child’s welfare, while being able, makes no provision for the child’s support and makes no effort to communicate with the child, which situation is sufficient to evince a willful rejection of parental obligations. If the efforts of such parent or legal custodian, or person primarily responsible for the child’s welfare to support and communicate with the child are, in the opinion of the court, only marginal efforts that do not evince a settled purpose to assume all parental duties, the court may declare the child to be abandoned. The failure by any such person to appear in response to actual or constructive service in a dependency proceeding shall give rise to a rebuttal presumption of such person’s ability to provide for and communicate with the child.
As we read the above definition, the reference to a child contemplates one that has been born. How could one be expected to communicate with an unborn child? We therefore conclude this adoption cannot be sustained by proof of pre-birth acts of abandonment.
However, we recognize that there is no clear legislative or case law authority on the issue of pre-birth abandonment in Florida. We certify that this is a question of great public importance,[19] due to its impact on Florida’s adoption statute and procedures. We therefore certify the following question to the Florida Supreme Court:
CAN THE FAILURE OF A PUTATIVE UNMARRIED FATHER TO ASSUME SUPPORT RESPONSIBILITIES AND MEDICAL EXPENSES FOR THE NATURAL MOTHER WHEN SHE REQUIRES SUCH ASSISTANCE AND HE IS AWARE OF HER NEEDS, BE A BASIS FOR A TRIAL COURT TO EXCUSE HIS CONSENT TO THE ADOPTION OF THE CHILD, ON THE GROUNDS OF ABANDONMENT OR ESTOPPEL, PURSUANT TO SECTION 63.072(1), FLORIDA STATUTES (1985).
Accordingly, we reverse the judgment of adoption in this case and certify the above question as one needing clarification by our State Supreme Court. To preserve the status quo in this situation, our mandate shall be stayed pending the acceptance or denial of jurisdiction by the supreme court in this case, and its ultimate disposition of this cause. Pending final resolution of the case, we direct that the trial court shall have jurisdiction to establish visitation rights for the natural parents.
REVERSED; QUESTION CERTIFIED.
COBB and COWART, JJ., concur.

. See In re Adoption of Cox, 327 So.2d 776, 778 (Fla.1976); Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1982).

. Wylie v. Botos, 416 So.2d 1253 (Fla. 4th DCA 1982).

. However, the record reveals that the natural mother lost her employment at a bank in February 1986, but obtained a babysitting job three weeks. She maintained this minimal employment until the end of July 1986.

. However, just prior to the child’s birth, the natural father said he did not want the child adopted.

. The record reveals, however, that the natural mother did not advise him of her Florida address or telephone number.

. However, the record reveals that in their last conversation before the child’s birth, the natural father told the natural mother not to "sign any papers,” and she agreed she would not do so.

. The natural father also immediately called the intermediary handling the adoption to tell him he wanted his child and flew to Orlando with baby clothes.

. The best interests of the child cannot he considered in a contest between natural parents and third parties, absent a finding of abandonment, that the parent is disabled from exercising custody, or that custody in the natural parent would otherwise be detrimental to the child. In re Adoption of Baby Girl C., 511 So.2d 345 (Fla. 2d DCA 1987); In re Guardianship of D.A. McW., 460 So.2d 368 (Fla.1984); Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983); In re Adoption of Cox, 327 So.2d 776 (Fla.1976).

. § 63.082(5), Fla.Stat. (1985); In re Adoption of Cox, 327 So.2d 776 (Fla.1976); Grabovetz v. Sachs, 262 So.2d 703 (Fla. 3rd DCA), cert. denied, 267 So.2d 329 (Fla.1972); compare In re Adoption of Baby Girl C, 511 So.2d 345 (Fla. 2d DCA 1987); In re Adoption of P.R. McD., 440 So.2d 57 (Fla. 4th DCA 1983).

. See Petition of Steve B.D., 112 Idaho 22, 730 P.2d 942 (Idaho 1986); In re Adoption of Child by P., 114 N.J.Super. 584, 277 A.2d 566 (A.D.1971); In re G.K.D., 332 S.W.2d 62 (Mo.App.1960).

. Guerra v. Doe, 454 So.2d 1 (Fla. 3rd DCA 1984), review denied, 462 So.2d 1106 (Fla.1985).

. The natural father’s written consent is also required in other circumstances not relevant to this case.

. § 63.062(1), Fla.Stat. (1985).

. Correct year is 1982.

. 2 Am.Jur.2d Adoption §§ 2, 3, 6; see In re Palmer’s Adoption, 129 Fla. 630, 176 So. 537 (1937).

. See In re Guardianship of D.A. McW., 429 So.2d 699 (Fla. 4th DCA 1983) approved, 460 So.2d 368 (Fla.1984).

. See Webb v. Blancett, 473 So.2d 1376 (Fla. 5th DCA 1985); Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983); In re Adoption of Braithwaite, 409 So.2d 1178 (Fla. 5th DCA 1982).

. Webb, supra.; see Turner v. Adoption of Turner, 352 So.2d 957 (Fla. 1st DCA 1977).

. Fla.R.App.P. 9.030(a)(2)(B)(i).